980 A.2d 61

COMMONWEALTH of Pennsylvania, Appellee

v.

CAM LY, Appellant.

Supreme Court of Pennsylvania.

Submitted Oct. 16, 2006.

Decided Oct. 1, 2009.

270

Jules Epstein, Kairys, Rudovsky, Messing & feinberg, Philadelphia, for Ly, Cam.

Amy Zapp, Harrisburg, Hugh J. Burns, Jr., Philadelphia District Attorney's Office, Philadelphia, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## OPINION

Justice BAER.

In this capital case, we consider Appellant Cam Ly's appeal from the order of the Court of Common Pleas of Philadelphia County denying relief under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546 ("PCRA"). For the following reasons, we affirm the denial of PCRA relief.

### I. Facts

*A. Crime and Investigation:*

At approximately 4:30 a.m. on August 14, 1983, one man, hereinafter "First Man," entered and requested a table at the Ho Sai Gai restaurant in the Chinatown section of Philadelphia. Minutes later, two others joined him, hereinafter, "Second Man" and "Third Man." All three were Asian men dressed in green military jackets. Upon being seated at a booth, the men drew the attention of the restaurant's customers and employees due to their loud and abusive behavior toward their waiter, Phong Ngo. One of the customers who observed the men was Charles Scanzello, an undercover police officer having lunch during his night shift.

After the other customers, including Scanzello, left the restaurant, the three informed Phong in Cantonese that they were "gangsters" from New York City and demanded that the restaurant pay them "protection money." With Phong provid-

ing translation, the restaurant manager, Jade Wong, refused to pay the demand.[1] First Man then rushed toward the cash register and attempted to open it. When Jade Wong followed him and demanded that they leave the restaurant, Second Man, later identified as Appellant Cam Ly (hereinafter "Second Man" or Appellant), and one of the other men placed their guns at the backs of Jade and Phong. The men corralled Jade and Phong into the kitchen, where Jade's sister, Janice Wong, had been watching the entire confrontation and was in the process of calling the police, without success. As Janice attempted to escape and seek help through the kitchen's side door, the three men pursued her. Eventually, Second Man grabbed her arm and turned her to face him at the well-lit street corner, allowing her ample time to view his face.

While the men pursued her sister Janice, Jade successfully reached the police. Jade was speaking with them by phone when the three returned with Janice in front of them. After taking several steps toward the dining area, Janice heard a gunshot and turned to see her sister Jade bleeding from her head and Second Man backing out of the side door of the kitchen, in the vicinity of where she would have expected the shooter to have been standing. Phong testified that he did not see the shooting but turned to see an arm in a green jacket, with gun in hand, going out the side door. Like Phong, Janice did not witness the actual shooting. When it occurred, however, Janice immediately ran to her sister, called police, and told Phong to lock all the doors of the restaurant.

At approximately the same time, a firefighter stationed at a nearby firehouse heard the gunshot and the commotion. He looked out the window to see two men running from the side door of the restaurant. Emergency personnel arrived at the restaurant soon after and took Jade to the hospital. After a week on life support, Jade Wong died due to the bullet wound to her head.

1. As will be discussed *infra,* Jade Wong and Officer Charles Scanzello had a romantic involvement that had concluded prior to the events in question.

The Philadelphia police initially followed investigatory leads related to similar extortionate crimes in Chinese restaurants in Philadelphia. The evidence led them to investigate Chinese gang activity up and down the East Coast, in particular focusing on members of the New York City based "Flying Dragons." After viewing hundreds of photographs in both New York and Philadelphia without identifying any of the assailants, Janice Wong identified a photograph of Ah Thank Lee, on September 8, 1983, as the First Man.

Between September 1983 and August 1985, Philadelphia detectives pursued many leads, obtained statements from various informants, and received other pieces of information from New York and Washington D.C. detectives, some of which Appellant now claims were improperly withheld from the defense in this case and in the case against Ah Thank Lee, as discussed in detail *infra* at 75.

Nearly two years after the murder, in August 1985, the police obtained a photograph of Appellant after he was arrested in New York on other charges. Janice Wong identified Appellant's photograph out of an array as the Second Man, the individual who grabbed her in the street and who shot her sister Jade. On the same day, however, officers showed Janice a single photograph of another individual, whom she identified as playing the role of First Man. The individual depicted, however, was Wong Kin Fung, and not Ah Thank Lee whom she had identified as First Man in 1983. Wong Kin Fung was known by the nickname Kwa Jai, which translates to "Bad Boy." As is relevant to Appellant's issues, the names Wong Kin Fung, Kwa Jai, and Bad Boy repeatedly appear in the documents obtained by Philadelphia detectives during their investigations. A central dispute in the current appeal concerns whether Janice Wong's conflicting identifications of Ah Thank Lee and Wong Kin Fung/Kwa Jai as First Man were disclosed to the defense before trial, and, if not, whether the failure to disclose the conflicting identifications and the other documents referencing Wong Kin Fung/Kwa Jai affected Appellant's ability to formulate a defense.

The array and the single photograph were also shown to Officer Scanzello on September 25, 1985. He positively identified Appellant as one of the individuals he noticed in the restaurant on the morning of the murder, but stated that he had not seen the individual in the single photograph (Wong Kin Fung/Kwa Jai).

Police arrested Appellant in New York and charged him with the murder of Jade Wong and other related offenses. Originally, Appellant and Ah Thank Lee were to be tried jointly; however, the trials were severed when Ah Thank Lee's counsel became ill. Third Man was eventually identified as Chanh Ta Luong, also known as Benson Luong (hereinafter "Benson Luong"); however, he was not arrested until April 1989, after Appellant's trial.

### B. The Trial of Cam Ly, Appellant

In January 1988, Appellant's case went to trial. The Commonwealth's theory of the case assigned the role of Second Man, the principal assailant and shooter, to Appellant, and the role of First Man to Ah Thank Lee, with Benson Luong as Third Man. Janice Wong identified Appellant as her sister's killer, testifying that she would never forget his face. She noted that she had observed Appellant while he was eating and facing the kitchen, during the confrontation around the cash register, under the streetlights when he prevented her escape, and, finally, in the kitchen following the shooting of her sister. Janice Wong claimed to be "100 percent" certain of the identification, but also testified that she was equally certain of her identifications of Ah Thank Lee and Benson Luong.[2] Notes of Testimony of Jury Trial ("N.T.(Jury)"), 1/26/1988, at 75, 99–100.

---

2. The relevance of the asserted certainty of her identification of Ah Thank Lee is that the Commonwealth knew that Janice had identified two separate individuals as First Man, Ah Thank Lee and Wong Kin Fung/Kwa Jai/Bad Boy. If the Commonwealth had revealed that information to the defense, defense counsel arguably could have questioned the reliability of Janice's identification of Appellant, given her prior conflicting identifications of the First Man.

Waiter Phong Ngo also identified Appellant from the witness stand as one of the three men upon whom he had waited and to whom he provided translation prior to the robbery and shooting, even though he had been unable to pick Appellant's photograph out of the array. Similarly, Officer Scanzello testified that Appellant was one of the individuals he saw in the restaurant.

Appellant's brother presented alibi testimony claiming that Appellant was in New York with him on the night of the killing. On cross-examination, the prosecutor asked the brother whether Appellant was a member of the Flying Dragons gang, and after counsel's objection was overruled, the brother testified that he did not have any knowledge of gang membership but admitted that Appellant had a dragon tattoo on his arm.

On February 1, 1988, at the close of the guilt phase, the trial court instructed the jury. Following some deliberation, the jury requested that the court repeat the instructions regarding the difference between murder in the first degree and murder in the second degree. Eventually, the jury convicted Appellant of first-degree murder, robbery, criminal conspiracy, and possession of an instrument of crime.

Immediately following the guilt phase, the penalty phase began. Without specifically informing the defense prior to the hearing of the aggravators to be pursued, the Commonwealth based its argument for the death penalty primarily on the record in the guilt phase. It additionally introduced evidence that Appellant had pled guilty to two robberies and an attempted robbery in New York. In closing, the prosecutor made several comments regarding Appellant's lack of remorse, past violent acts, and his lack of respect for the rule of law.

Defense counsel presented mitigation testimony focused on Appellant's three-year-old son in an attempt to humanize Appellant. Appellant testified during the penalty phase and professed his innocence, but did not provide any other mitigating information. During defense counsel's closing statement,

he suggested that Appellant could be paroled if sentenced to life in prison. On February 2, 1988, upon finding three aggravating factors [3] and no mitigating factors, the jury returned the statutorily mandated death sentence. 42 Pa.C.S. § 9711(c)(iv). Following the denial of post-verdict motions, the trial court imposed consecutive sentences of seventeen and one-half to thirty-five years of imprisonment for the remaining charges.

### C. The Trial of Ah Thank Lee

A jury convicted Ah Thank Lee of second-degree murder and related charges in June 1988 for which he received a sentence of life imprisonment. However, as will be discussed in detail during the summary of the PCRA proceedings in this case, Ah Thank Lee's conviction was overturned by the PCRA court due to the Commonwealth's failure to disclose evidence that Janice Wong had identified both Ah Thank Lee and Wong Kin Fung/Kwa Jai as First Man in violation of Ah Thank Lee's right to be apprised of exculpatory evidence in accord with *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The Commonwealth in open court declared that it would not retry him.

### D. The Trial of Benson Luong

Benson Luong was not arrested until April 1989. After confessing to his involvement and naming Appellant and Wong Kin Fung/Kwa Jai as his co-conspirators, Benson Luong was convicted of murder in the third degree and related crimes and sentenced to imprisonment.

### E. Appellant's Direct Appeal:

In his direct appeal to this Court, Appellant raised eighteen issues. Finding the evidence sufficient and rejecting Appellant's claims of error, this Court affirmed the judgment of

3. The aggravators found were a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9); murder in perpetration of a felony, § 9711(d)(6); and grave risk of death to another person in addition to the victim, § 9711(d)(7).

sentence. *Commonwealth v. Ly,* 528 Pa. 523, 599 A.2d 613 (1991). We need not discuss our resolution of all the issues, but instead recount only those relating to Appellant's PCRA claims.

On direct appeal, this Court addressed Appellant's guilt phase jury instruction challenge as follows:

[A]ppellant claims that his counsel was ineffective for failing to object to jury instructions to the effect that malice and intent to kill may be inferred from all the circumstances of the offense, including the use of a deadly weapon upon a vital part of the body. Appellant claims that his trial counsel failed to request an instruction clearly indicating that the Commonwealth had the burden to prove malice and intent to kill beyond a reasonable doubt because without such a charge, the burden shifted to appellant to disprove malice or intent to kill.

*Ly,* 599 A.2d at 619. We concluded that "[t]he charge considered as a whole was proper and therefore appellant's counsel was not ineffective for failing to object or in failing to seek additional instructions." *Id.*

Regarding mitigation, we concluded that counsel was not ineffective in failing to utilize that Appellant had a limited education, a young son, tuberculosis, and was under the influence of drugs during the prior robberies.[4] The Court further noted that counsel could not have been ineffective for failing to introduce a mental health report, because the evaluation was not completed until the day after the penalty hearing and because Appellant did not allege that he informed his counsel of his mental health issues prior to the penalty hearing. Moreover, we concluded that even if counsel should have known of the asserted issues, counsel nonetheless reasonably presented mitigation evidence through direct examination of Appellant during the penalty phase proceedings when he

4. Although our Court has determined in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726, 738 (2002), that claims of trial counsel ineffectiveness should be delayed until collateral review, we addressed the claims of trial counsel ineffectiveness on direct appeal in this case because it pre-dated the decision in *Grant.*

adduced evidence concerning Appellant's young son and the extent of Appellant's education. Additionally, we observed that counsel asked Appellant on the witness stand whether there was anything else he would like the jury to know before they sentenced him, and Appellant did not respond with more information. Finally, we also stated that it would have been a reasonable trial strategy not to focus upon his prior drug use.

### F. PCRA:

On December 7, 1995, Appellant filed a timely petition pursuant to the PCRA.[5] In the original petition, Appellant raised numerous claims, which, as relevant to the current appeal, included assertions of the Commonwealth's failure to disclose exculpatory evidence and ineffectiveness of trial counsel for failure to investigate Appellant's history in preparing a penalty phase defense. Appellant also asserted the ineffectiveness of trial and appellate counsel to the extent they failed to raise these issues prior to the PCRA stage. Appellant additionally asserted a claim of newly discovered evidence in the form of Benson Luong's testimony at Ah Thank Lee's trial.[6] PCRA Petition at 33. The Commonwealth filed motions to dismiss the PCRA petition.

In April 2000, the PCRA court held over four days of hearings relating to the questions of ineffectiveness of trial counsel's investigation of mitigation evidence and the claims of discovery violations. Cecilia Alfonso, a mitigation specialist, testified on Appellant's behalf about the results of her investigation into his life history, including his life as a young child in a Chinese enclave in Saigon during the Vietnam War. The investigation also revealed an abusive father and detailed the

5. Although the original petition is dated October 3, 1995, it is referenced as having been filed December 7, 1995. In either event, the petition is timely because it was filed within one year of January 17, 1996, the effective date of the relevant PCRA amendments. 42 Pa.C.S. § 9545(b)(1); *Commonwealth v. Rollins*, 558 Pa. 532, 738 A.2d 435, 440 n. 5 (1999).

6. Appellant claims that Luong's statement exonerates him because Luong disavowed a prior statement implicating Appellant and instead described the third individual along with himself and Kwa Jai as six feet tall, as opposed to Ly who is only five feet six inches tall.

extreme conditions suffered under the Communist regime in Vietnam and during Appellant's escape to the United States. Alfonso noted that mitigation evidence could have been presented to show Appellant's positive role in helping his siblings escape Vietnam and establish themselves in the United States. Alfonso's testimony was corroborated by testimony from Appellant's siblings.[7]

PCRA counsel also called trial counsel to testify. Notes of Testimony from PCRA Hearing ("N.T.(PCRA)"), 4/4/00, at 303. Trial counsel testified that he only visited with Appellant twice prior to trial and did not otherwise communicate with him either in writing or by phone. N.T.(PCRA), 4/4/00, at 374–75. The Commonwealth's attorney asked trial counsel if "in discussing with him the fact that he was facing capital punishment, did you ask him if he could tell you anything that might be helpful at the penalty phase," to which he replied, "No." N.T.(PCRA), 4/4/00, at 377.

Although trial counsel testified that he did not investigate Appellant's background prior to trial by questioning Appellant's family, he stated that he did employ an investigator to look into Appellant's alibi claim that he was at home with his family in New York City at the time of the murders. Trial counsel also stated that during trial, in the courtroom, he talked to someone he believed was Appellant's sister, who in reality was Appellant's soon-to-be sister-in-law, Mimi Lee. He asked her what type of person Appellant was in the hope of showing him in his "best light." Trial counsel also noted that he did not "speak with her [Mimi Lee] about . . . anything which would have been a childhood trauma" because he did not "think the case lent itself to that." N.T.(PCRA), 4/4/00 at 313. Trial counsel continued that he thought the jury would have viewed evidence relating to his childhood as "insulting." N.T.(PCRA), 4/4/00, at 386. Addressing Appellant's claims that the prosecution failed to disclose exculpatory information, trial counsel averred during the PCRA hearing that certain

7. The details of the testimony and Appellant's claims are set forth in connection with Appellant's claim of counsel ineffectiveness for failure to conduct a proper mitigation investigation, *see infra* at 90, n.32.

pieces of evidence were not disclosed to him before or during the trial, and that the evidence would have been helpful to the defense.[8]

Appellant also called Joe Fasano, a detective in the New York City Jade Squad, a unit devoted to gang activity in New York's Chinatown. Detective Fasano addressed one entry in the Philadelphia Police activity sheets that implied that the Jade Unit told the Philadelphia police that an informant named Kwa Jai as the shooter in Jade Wong's murder. The entry is discussed in the briefs and this opinion as "Entry 149." The testimony will be discussed in detail in connection with our analysis of Appellant's claims on appeal. Testimony was also presented regarding Officer Scanzello's potential bias due to a prior romantic relationship with Jade Wong, discussed *infra* at 81–82.

The Commonwealth called Philadelphia Detective Leon Lubiejewski and Assistant District Attorney Arlene Fisk to speak to whether the allegedly exculpatory evidence had been disclosed and, if not, the reasons why the evidence was not disclosed. Detective Lubiejewski addressed Entry 149 relating to Detective Fasano's reference to Philadelphia police activity sheets implying that the New York City's Jade Unit had informed Philadelphia police that a New York informant had identified Kwa Jai as Jade Wong's killer. N.T.(PCRA), 4/7/00, at 719–720. Although not in the log, Detective Lubiejewski indicated that he had asked New York for the informant's identity, but Detective Fasano, on behalf of New York police, had refused to divulge it.[9]

Argument on the issues was held in October 2000. Essentially, PCRA counsel argued that the Commonwealth withheld evidence that did not confirm the Commonwealth's theory of the crime, in violation of Appellant's due process and *Brady* rights. Counsel argued further that even if this evidence did not clear Appellant of involvement in the crime, it at least

8. The individual pieces of allegedly non-disclosed evidence will be addressed in detail *infra* at 74–75.

9. The hearing was continued until June 2000 due to the court's schedule.

created a reasonable doubt as to who fired the fatal shot. The failure to produce certain pieces of evidence, Appellant asserted, made it impossible for defense trial counsel to understand the significance of the evidence that was disclosed; for instance, counsel could not have recognized the significance of some of the evidence referencing Kwa Jai, unless he had known that Janice Wong had identified Kwa Jai's photograph, as well as Ah Thank Lee's, as First Man.[10]

On October 3, 2001, the PCRA court denied Appellant's PCRA petition and granted the Commonwealth's motion to dismiss. On October 23, 2001, however, the PCRA court granted Appellant's motion to reconsider and vacated its October 3, 2001 order dismissing the PCRA petition in order to allow supplementation of the record with affidavits.

Out of an abundance of caution, the PCRA court repeatedly continued Appellant's PCRA case during 2001, 2002, and 2003, pending ongoing discovery and negotiations in the parallel PCRA proceedings involving Ah Thank Lee. As previously discussed, Janice Wong had identified two individuals as the First Man, Ah Thank Lee and Wong Kin Fung/Kwa Jai. During Ah Thank Lee's PCRA proceedings, it became apparent that several documents exculpatory to Ah Thank Lee had not been disclosed to Ah Thank Lee's counsel prior to trial. Accordingly, on April 14, 2004, the PCRA court granted Ah Thank Lee's PCRA petition for a new trial based on the previously undisclosed evidence relating to Wong Kin Fung/Kwa Jai. At the same hearing, an attorney for the Commonwealth indicated that it would not appeal and, indeed, would not seek a retrial of Ah Thank Lee. The PCRA court granted Ah Thank Lee's motion to *nol pros* the charges.

After finally disposing of Ah Thank Lee's case, the PCRA court indicated its intent to deny Appellant's PCRA petition, but first granted PCRA counsel's request to withdraw and ordered new PCRA counsel appointed (hereinafter "New

10. Alternatively, PCRA counsel asserted that to the extent trial counsel received some of the evidence before or during trial, trial counsel was ineffective for failing to investigate fully the information he received, and fashion a defense premised upon it.

Counsel"). New Counsel was appointed to represent Appellant on May 11, 2004, and subsequently filed supplemental motions. After a hearing on June 24, 2004, the case was continued until October to allow the New Counsel to review the record.

New Counsel submitted a final amended PCRA petition on September 28, 2004, addressing this Court's then-recent decision in *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014 (2003), by briefing layered claims of ineffectiveness of direct appellate counsel and PCRA counsel for failing to plead trial counsel ineffectiveness. The supplemental PCRA petition specifically declined to offer a layered argument for Appellant's claims of ineffectiveness of trial counsel in regard to a failure to investigate mitigation evidence; instead New Counsel suggested that direct appellate counsel was not ineffective because "[c]ourt appointed counsel on a direct capital appeal has no investigative resources and no capacity to seek funding for a proper mitigation investigation, and the deficiencies in the original penalty hearing cannot be proved from record evidence."[11] Memorandum of Law in Support of Final Amended Petition, 9/27/04, at 11, n.5. Finally, the final amended PCRA petition contained a claim of ineffective assistance of counsel for failure to challenge the trial court's instructions on specific intent to kill and accomplice liability.

On October 14, 2004, the PCRA court granted the Commonwealth's motion to dismiss Appellant's PCRA petition. On October 29, 2004, Appellant filed a notice of appeal to this Court, and, on November 30, 2004, filed a statement of matters to be complained of on appeal in compliance with Pa. R.A.P.1925, raising twenty-eight issues. The PCRA court addressed these twenty-eight issues in a mere twelve pages, a contrast to the extensive hearings properly conducted by the PCRA court. We will address the PCRA court's holdings in

11. In reply to the Commonwealth's brief before this Court asserting waiver of these claims for failure to layer, New Counsel attempts to assert his own ineffectiveness for failure to layer the claims, or, alternatively, to withdraw to allow for the appointment of new counsel to assert current counsel's ineffectiveness. Reply Brief for Appellant at 18–19.

connection with our discussion of each of the issues raised to this Court by Appellant.

## II. Standard of Review

■■ In the current appeal to this Court, Appellant raises seven issues with several subparts, which we have reordered for ease of discussion. Our standard of review of a trial court's denial of PCRA relief is "whether the ruling of the PCRA court is supported by the record and free of legal error." *Commonwealth v. Rios,* 591 Pa. 583, 920 A.2d 790, 798 (2007). Relief may only be granted under the PCRA upon an appellant's proof by a preponderance of the evidence that his conviction or sentence resulted from any of the following factors: [12]

(i) A violation of the Constitution of Pennsylvania or laws of this Commonwealth or the Constitution of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(ii) Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

(iii) A plea of guilty unlawfully induced where the circumstances make it likely that the inducement caused an individual to plead guilty.

(iv) The improper obstruction by Commonwealth officials of the petitioner's right of appeal where a meritorious appealable issue existed and was properly preserved in the trial court.

---

**12.** We note that Appellant's initial PCRA petition was filed prior to the effective date of the 1995 amendments to the PCRA, which became effective in January 1996. Accordingly, we will apply the pre-amendment PCRA. *See Commonwealth v. Tedford,* 598 Pa. 639, 960 A.2d 1, 11–15 (2008) (discussing implications of 1995 amendments). Appellant does not suggest, nor do we find, that the amendments would alter our analysis of the issues presented in Appellant's PCRA petition.

(v) A violation of the provisions of the Constitution, law or treaties of the United States which would require the granting of Federal habeas corpus relief to a State prisoner.

(vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

(vii) The imposition of a sentence greater than the lawful maximum.

(viii) A proceeding in a tribunal without jurisdiction.

42 Pa.C.S. § 9543(a)(2)(amended 1995). We cannot grant relief upon an issue that has been previously litigated or waived. *See Rios*, 920 A.2d at 799. An appellant will be deemed to have waived an issue "if the petitioner failed to raise it and if it could have been raised before the trial, at the trial, on appeal, in a habeas corpus proceeding or other proceeding actually conducted or in a prior proceeding actually initiated under this subchapter." 42 Pa.C.S. § 9544(b)(amended 1995).

A number of Appellant's claims sound in the ineffectiveness of counsel. We recently set forth the requirements for claims of ineffectiveness of counsel:

To merit relief based on an ineffectiveness claim under the PCRA, a petitioner must show that such ineffectiveness "in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). We have interpreted this standard to require a petitioner to prove that: (1) the underlying claim is of arguable merit; (2) counsel's performance lacked a reasonable basis; and (3) the ineffectiveness of counsel caused the petitioner prejudice. "A chosen strategy will not be found to have lacked a reasonable basis unless it is proven 'that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.'" *Commonwealth v. (Rasheed) Williams*, [587 Pa. 304, 899 A.2d 1060, 1064 (2006)] (quoting *Commonwealth v.*

*Howard,* [553 Pa. 266, 719 A.2d 233, 237 (1998)] ). To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's error or omission, the result of the proceeding would have been different. A reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding. A failure to satisfy any one of the three prongs of the test for ineffectiveness requires rejection of the claim.

*Commonwealth v. Collins,* 598 Pa. 397, 957 A.2d 237, 244–45 (2008) (some citations and footnotes omitted).

As in *Collins,* Appellant's case pre-dates our decision in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), in which we held that all claims of trial counsel ineffectiveness should be raised at the PCRA stage rather than on direct appeal. Prior to *Grant,* claims of trial counsel ineffectiveness were waived if not raised by new counsel on appeal. *See Commonwealth v. Hubbard,* 472 Pa. 259, 372 A.2d 687 (1977). Accordingly, any claims of ineffectiveness of trial counsel not previously raised must be framed as "layered claims" under *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014, 1023 (2003). We explained,

That is, to be eligible for relief on these ... claims, appellant must plead and prove that: (1) trial counsel was ineffective for a certain action or failure to act; and (2) direct appeal counsel was ineffective for failing to raise trial counsel's ineffectiveness. As to each relevant layer of representation, appellant must meet all three prongs of the [*Commonwealth v. (Charles) Pierce,* 515 Pa.153, 527 A.2d 973 (1987) ] test for ineffectiveness. A failure to satisfy any of the three prongs of the *Pierce* test requires rejection of a claim of ineffective assistance of trial counsel, which, in turn, requires rejection of a layered claim of ineffective assistance of direct appeal counsel.

*Collins,* 598 Pa. 397, 957 A.2d 237, 244–245 (2008) (some citations and footnotes omitted).

After reading the voluminous PCRA record in this case, we commend the PCRA court judge for his patience with the

necessary discovery and testimony in this case and the caution he exhibited in delaying decision until the resolution of the companion case of Ah Thank Lee. Although we conclude that Petitioner's issues require more extensive consideration than that provided in the PCRA court's brief opinion, we agree with the ultimate denial of relief.

### III. Waiver

Initially, the Commonwealth asserts that Appellant waived all his claims by failing to prove by a preponderance of the evidence that they were preserved for appeal or that subsequent counsel was ineffective for failing to preserve them. The Commonwealth asserts that Appellant has offered no proof in the form of testimony as to direct appellate counsel's ineffectiveness for failing to raise the ineffectiveness of trial counsel on direct appeal. It further argues that Appellant failed to meet his burden of proof on many of his issues because trial counsel only testified to his strategic basis at the PCRA hearing regarding the issues of discovery violations and the sufficiency of mitigation investigation, and did not testify to his strategy regarding the majority of his issues, a critical element for ineffectiveness of counsel claims.[13]

In contrast, Appellant notes that New Counsel, his current PCRA counsel, filed a supplement to the PCRA petition in

---

**13.** The Commonwealth also contends that Appellant's claims should be summarily dismissed because Appellant failed to satisfy 42 Pa.C.S. § 9545(d)(1) when he did not file certifications regarding the substance of trial or direct appellate counsel's expected testimony at the PCRA hearing:

> (1) Where a petitioner requests an evidentiary hearing, the petition shall include a signed certification as to each intended witness stating the witness's name, address, date of birth and substance of testimony and shall include any documents material to that witness's testimony. Failure to substantially comply with the requirements of this paragraph shall render the proposed witness's testimony inadmissible.

42 Pa.C.S. § 9545; *see also Commonwealth v. Brown,* 767 A.2d 576 (Pa.Super.2001). To the extent that the Commonwealth is objecting to the testimony provided at the PCRA hearing, we reject the claim as waived by the Commonwealth because it fails to cite to any objection it raised during the PCRA proceedings. We additionally observe that the effective date of Section 9545(d)(1) is January 1996, which is after the filing date of Appellant's initial PCRA petition.

October 2004, which raised claims of appellate counsel and prior PCRA counsel's ineffectiveness for failure to raise and layer properly the relevant issues. Given the amendment and current PCRA counsel's attempt to layer the claims in his briefs to this Court, we will consider the sufficiency of the layering in regard to each question presented rather than dismissing all claims without further discussion.

*Guilt Phase Claims*

## IV. Brady Claims

Appellant claims that the Commonwealth withheld exculpatory evidence from Appellant in violation of his Fourteenth Amendment right to due process as set forth in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its federal and Pennsylvania progeny. Appellant asserts that the failure to reveal the evidence, which primarily related to Wong Kin Fung/Kwa Jai's alleged involvement in the crime, undermined Appellant's ability to develop alternative theories and defenses in the guilt phase and to present mitigation evidence relating to his reduced role in the crime in the penalty phase.[14] In contrast, the Commonwealth claims that the evidence either was disclosed to defense counsel or was not subject to disclosure because it was merely an investigative lead or rumor.[15]

---

**14.** Appellant contends that evidence that he was an accomplice rather than the shooter would be relevant to two mitigating factors, specifically, 42 Pa.C.S. § 9711(e)(7) ("The defendant's participation in the homicidal act was relatively minor.") and (8) ("Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.").

**15.** The Commonwealth also claims that Appellant waived the claim by failing to raise it on direct review. Appellant refutes the Commonwealth's claim that he should have asserted the claim as a layered ineffectiveness of counsel claim: "As to the *Brady* claim, as the Commonwealth failed to disclose material evidence, appellate counsel cannot be faulted for failing to argue that which he was not privy to." Brief for Appellant at 79. Given that much of the asserted evidence appears to have been divulged by the Commonwealth only after repeated discovery requests in the PCRA proceedings, we refuse to find the claim waived for failure to raise it on direct appeal.

 Before considering the specific items of allegedly withheld evidence, we review the relevant law. Under *Brady,* the prosecution's failure to divulge exculpatory evidence is a violation of a defendant's Fourteenth Amendment due process rights. "[T]o establish a *Brady* violation, a defendant is required to demonstrate that exculpatory or impeaching evidence, favorable to the defense, was suppressed by the prosecution, to the prejudice of the defendant." *Commonwealth v. Gibson,* 597 Pa. 402, 951 A.2d 1110, 1126 (2008).

 The burden of proof is on the defendant to demonstrate that the Commonwealth withheld or suppressed evidence. *See Commonwealth v. Porter,* 556 Pa. 301, 728 A.2d 890, 898 (1999). The United States Supreme Court has held, "[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (footnote omitted). Similarly, this Court has limited the prosecution's disclosure duty such that it does not provide a general right of discovery to defendants. *See Commonwealth v. Counterman,* 553 Pa. 370, 719 A.2d 284, 297 (1998). Moreover, we have held that the prosecution is not obligated to reveal evidence relating to fruitless leads followed by investigators. *See Commonwealth v. Crews,* 536 Pa. 508, 640 A.2d 395, 406 (1994).

 "To satisfy the prejudice inquiry, the evidence suppressed must have been material to guilt or punishment." *Gibson,* 951 A.2d at 1126–1127 (Pa.2008). As noted by Appellant, materiality extends to evidence affecting the credibility of witnesses, rather than merely to purely exculpatory evidence. *See Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule."). Moreover, we have held that the protection of *Brady* extends to the defendant's ability to investigate alternate defense theories and to formulate trial strategy. *See Com-*

*monwealth v. Green,* 536 Pa. 599, 640 A.2d 1242, 1245 (1994) (holding that courts must "consider any adverse effect that the prosecutor's failure to disclose might have had on not only the presentation of the defense at trial, but the preparation of the defense as well."). "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley,* 514 U.S. 419, 433–434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)(internal quotation marks omitted).

██ As to *Brady* claims advanced under the PCRA, a defendant must demonstrate that the alleged *Brady* violation "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *See Commonwealth v. Copenhefer,* 553 Pa. 285, 719 A.2d 242, 259 (1998). The Commonwealth notes that the United States Supreme Court has held that "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109–110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). With that as background, we review the categories of allegedly withheld evidence.

### A. Janice Wong's identification of Wong Kin Fung/Kwa Jai as "First Man"

██ One of the lynchpins of Appellant's *Brady* claim is Janice Wong's identification of Wong Kin Fung/Kwa Jai as the First Man on the same day she identified the photograph of Appellant as the Second Man. As noted, her identification of Wong Kin Fung/Kwa Jai directly conflicts with her prior identification of Ah Thank Lee, and could have been used to question the certainty of her identification of Appellant, or to challenge her assertion that Appellant, rather than Wong Kin Fung/Kwa Jai fired the fatal shot.

The first question is whether the information was disclosed. Trial counsel testified that the prosecution failed to inform him of the conflicting identification. N.T.(PCRA), 4/4/00, at 339–40. The PCRA court concluded that the Commonwealth had disclosed this information based on testimony of ADA Fisk indicating that she provided documentation to the defense of Janice Wong's identification of Appellant from an array of photographs and her identification of a single photograph of Wong Kin Fung/Kwa Jai as First Man. PCRA Ct. Slip Op, at 4. ADA Fisk contended that a document indicating the display of a single photograph to Wong should have alerted defense counsel that the investigators had shown Wong a photograph depicting someone other than Ah Thank Lee, because Ah Thank Lee had already been identified and was represented by counsel.[16] Appellant counters that this was not sufficient disclosure of the conflicting identification.[17] Appellant notes that ADA Fisk testified that the face of Janice Wong's statement did not reveal the identity of the single photograph as Wong Kin Fung/Kwa Jai. N.T.(PCRA), 6/7/00, at 940. Moreover, the Commonwealth's attorney at the PCRA hearing verified that the PCRA exhibit of the statement allegedly disclosed to defense counsel attached only Appellant's photograph and not the single photograph of Kwa Jai. N.T.(PCRA), 6/7/00, at 941; PCRA Exhibit C–10.

Upon review, we determine that the PCRA court erred in concluding that the conflicting identifications made by Janice Wong were disclosed to defense counsel prior to trial. Instead, the testimony by ADA Fisk indicates only that she supplied counsel with Janice Wong's statement of August 8,

**16.** ADA Fisk claimed,

> I would note that the August 8, 1985, statement is clear that the single photograph shown to Janice Wong is not Ah Thank Lee only because under the rules of law it would have been absolutely prohibited in August 1985 to show [Lee's] photo singly. He had already been identified in an array and he was represented by counsel. N.T.(PCRA), 6/7/00, at 943.

**17.** To the extent that we would find that the Commonwealth sufficiently disclosed the misidentification, Appellant drops a footnote noting that, if the statement should have alerted trial counsel to the conflicting identification, then counsel was ineffective for not pursuing the lead.

1985, indicating only that Wong identified a photograph in an array as depicting Appellant, as the Second Man, and that she identified a single photograph shown to her as the First Man. We refuse to hold that trial counsel should have divined the identity of the individual in the undisclosed single photograph as someone other than Ah Thank Lee from the mere fact that one unidentified photograph was shown to the witness. The Commonwealth fails to reveal why Appellant's trial counsel should have realized that the Commonwealth had a new suspect in the case rather than assuming that the Commonwealth merely engaged in improper procedures relating to Ah Thank Lee, a co-defendant who was not Appellant's trial counsel's client. Accordingly, we cannot accept the PCRA court's conclusion that trial counsel "pursued a valid strategy" of not raising the issue of the conflicting identifications when it is not clear that counsel knew of the identification of Wong Kin Fung/Kwa Jai that conflicted with the prior identification of Ah Thank Lee as the First Man. This is not a question of counsel's ineffectiveness in failing to pursue an issue but instead is a question of whether Appellant's constitutional rights, protected by *Brady,* were violated by the Commonwealth's failure to disclose the evidence.

Regarding the second element of a *Brady* claim, whether the non-disclosed evidence was favorable to the defense because it was exculpatory or related to the credibility of a witness, trial counsel testified that the information would have been useful in challenging Janice Wong's ability to identify accurately the individuals involved in the crime, especially when the identifications occurred over two years after the crime. N.T.(PCRA), 4/4/00, at 344–45. Appellant argues that the conflicting identifications are especially damning given that Janice Wong testified in response to the prosecution's question at trial that she was one hundred percent sure of all her identifications. N.T.(Jury), 1/26/88, at 75, 99–100. The Commonwealth counters that Janice Wong never misidentified Appellant's photograph and never suggested that Wong Kin Fung/Kwa Jai played the role credited to Appellant. Accord-

ingly, the Commonwealth claims that the misidentification of Appellant's primary accomplice was not exculpatory.

We conclude that Appellant met his burden of demonstrating that the evidence was favorable because it related to the credibility of a key witness. Accordingly, we hold that the conflicting identification should have been disclosed because it could have been used to question Janice Wong's identification of Appellant as the shooter, especially given the prosecution's attempt to bolster Janice Wong's identification of Appellant with her identification of Ah Thank Lee. *See Giglio,* 405 U.S. at 154, 92 S.Ct. 763 ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule.").

Although we determine that the identification by Janice Wong of Wong Kin Fung/Kwa Jai was improperly withheld, we conclude that Appellant was not prejudiced by the non-disclosure in either the guilt or the penalty phase, and thus, Appellant has not met his burden for relief under *Brady.* Janice Wong never wavered in her identification of Appellant as the shooter and she presented clear and explicit testimony as to why she remembered Appellant so clearly given their encounter under the streetlight at gunpoint. Moreover, during proceedings related to Ah Thank Lee's case, Janice Wong explained the misidentification by stating that she assumed the photograph of Wong Kin Fung/Kwa Jai was a more recent photograph of the same person she previously identified, Ah Thank Lee. While the identification of Wong Kin Fung/Kwa Jai was clearly material and prejudicial in the case of Ah Thank Lee, because Janice Wong identified both as the First Man, the conflicting identifications do not alter her identification of Appellant as the shooter; nor do they do anything to suggest that Wong Kin Fung/Kwa Jai fired the fatal shot, rather than Appellant.[18] Therefore, the conflicting identifications of the individual playing the role of First Man do not undermine the jury's verdict regarding Appellant's role as the

18. Moreover, as discussed *infra* at 297–300, 980 A.2d at 78–79 the only documents naming Wong Kin Fung/Kwa Jai as the shooter were not discoverable.

shooter. Accordingly, we conclude that Appellant failed to demonstrate that the alleged *Brady* violation so undermined the truth determining process that no reliable adjudication of guilt or innocence could have occurred. *See Copenhefer,* 719 A.2d at 259.

### B. Information from New York City Police Department that Wong Kin Fung/Kwa Jai was the shooter[19]

▮ Appellant also challenges Entry 149 of the activity sheets of the Philadelphia Police Department, which the Commonwealth acknowledges it did not disclose prior to trial. Entry 149 provides that on September 1, 1983, Detective Fasano of New York City's Jade Squad, informed Philadelphia detectives that one of his informants, whom he refused to identify, had information that the shooting was committed by four males of Chinese ethnicity: two from Hong Kong and two from Vietnam. The informant asserted that two of the males were from Philadelphia, one was from New York, and one was from Washington D.C. He additionally claimed that the shooter was the individual from Washington D.C., whose nickname was "Kwa Jai." [20]

19. Although the PCRA court specifically addressed the alleged non-disclosure of Janice Wong's identification of Wong Kin Fung/Kwa Jai, it failed to address adequately the other categories of *Brady* allegations, addressing them in one summary paragraph:

After-discovered exculpatory evidence requires a new trial. Defendant mounted a vigorous attack on his conviction and sentence alleging the failure of the Commonwealth to turn over discoverable exculpatory information. As the hearings on defendant's PCRA petition revealed, much of what he claimed was withheld was in fact turned over. Moreover, even those items which defendant could arguably suggest should have been turned over to him pre-trial do not exonerate or tend to mitigate the sentence in this matter. This Court's review of the materials subsequently provided to defendant establishes that they buttress and corroborate the evidence of defendant's culpability. Defendant cannot establish that this material, if withheld, in anyway prejudiced his case.

PCRA Ct. Slip Op, at 11. Although we arrive at the same conclusion, we will address the merits of each of Appellant's claims.

20. Appellant's Supplemental Submission of *Brady* Material filed in December 2001, Exhibit G, also includes other pieces of evidence from the Commonwealth's files relating to the New York City Police Department that link Kwa Jai to the murder. These documents apparently

As noted, the Commonwealth does not contest the first element of *Brady* in regard to Entry 149 because it is undisputed that this part of the police log was not revealed to defense prior to trial. Thus, we consider whether the evidence should have been disclosed as exculpatory material. At the PCRA hearings, trial counsel testified that this evidence implicating Kwa Jai as the shooter would have been extremely useful to the defense to contradict the Commonwealth's theory that Appellant was the shooter. Appellant presented the testimony of Detective Fasano, to substantiate the information in the entry and to discuss the investigation relating to Kwa Jai, in part to demonstrate that this was not merely an unsubstantiated rumor. Fasano related that the informant was "an active high-up gang member who was part of [the Flying Dragons]." N.T.(PCRA), 4/5/00, at 456, 458. He acknowledged that his informant was not an eyewitness to the crime. Fasano, however, admitted that he would not have revealed the identity of the informant in 1983.[21] Fasano also testified that the names Kwa Jai and Wong Kin Fung referred to the same individual who was killed in New York in January 1984, and that the Philadelphia police log indicated that the Philadelphia Police had discussed Wong Kin Fung with Fasano and with the Immigration Service and had determined his date of birth and immigration number.

To counter Appellant's claim that Entry 149 of the Philadelphia police activity sheets should have been disclosed prior to

were disclosed initially during the PCRA Hearings in Ah Thank Lee's PCRA proceedings. Appellant does not list them individually in his brief, but he does reference them collectively. Specifically, the files include an undated handwritten note from Detective Donovan of the New York City Police Department to one of the Philadelphia detectives that referenced and enclosed photos of Kwa Jai and stated, "[h]e was shot and killed on 1/20/84 in New York City. This is the person that is rumored to be the shooter in your case in Phil." Additionally, another undated handwritten note revealed the same information that was supplied by Detective Fasano in Entry 149.

21. Despite Fasano revealing the informant's nickname and identifying him in a photograph at the PCRA hearing, PCRA counsel was unable to establish contact with the informant and thus could not determine the source of the informant's information, which suggests the difficulty trial counsel would have had at the time of trial in identifying the informant without the nickname or photograph.

trial, ADA Fisk explained that she turned over only redacted portions of the running logs, because she believed that the law only required the Commonwealth to turn over statements of witnesses, but not aspects of the investigative process that "did not turn into actual either inculpatory or exculpatory information." N.T.(PCRA), 6/7/00, at 915. She then defended her decision not to turn over Entry 149:

> This, like a great deal of other information that police had was a rumor, exactly that, a rumor that one police officer from another jurisdiction had said to the police officers here. The investigators here attempted to pursue that, attempted to find any kind of information that would either substantiate or refute that rumor. None was ever obtained.

N.T.(PCRA), 6/7/00, at 916. Fisk contended that if a witness had been located and a statement given, the statement would have been disclosed. N.T.(PCRA), 6/7/00, at 948. She emphasized that Fasano was unwilling to identify his informant. Citing our decision in *Crews*, 640 A.2d at 406, the Commonwealth echoes ADA Fisk's contention that unsuccessful leads and unsubstantiated gossip are not evidence favorable to the accused that invokes the protections of *Brady*.

Initially, we determine that the entry has clear exculpatory value given that it implicates another individual in the criminal role assigned to Appellant. Nevertheless, the failure to disclose is not prejudicial. As indicated, Detective Fasano refused to reveal the identity of his informant, which could have allowed determination of the source of the information, evidence that then could have been presented at trial. Absent an identity, the statement is an unsubstantiated rumor, which under *Crews* is not subject to *Brady* protections. *See Crews*, 640 A.2d at 406 (holding, based on Pa.R.Crim.P. 305(B)(1)(a),[22] that prosecution is not obligated to reveal evidence relating to fruitless leads followed by investigators).

**22.** Former Pa.R.Crim.P. 305 has been renumbered as Pa.R.Crim.P. 573, and was promulgated in response to *Brady*. *See Commonwealth v. Green*, 536 Pa. 599, 640 A.2d 1242, 1246 (1994).

## C. *Wing Tsang's statement*

The next challenged piece of evidence documents an August 1985 interview by New York City Police of one of the leaders of the Flying Dragons gang, Wing Tsang. Wing Tsang asserted that Appellant [23] confessed to him that he shot a woman at the Ho Sai Gai Restaurant in Philadelphia, and that Kwa Jai and Benson Luong were with him. His statement collaborated the information that Wong Kin Fung/Kwa Jai was the individual that went to the cash register. He provided descriptions of Appellant, Kwa Jai, and Benson Luong. Wing Tsang also revealed that he and another leader of the Flying Dragons had travelled to Philadelphia to meet with the owner of the Ho Sai Gai a few months after the shooting and informed him that Kwa Jai had been the shooter and that he had been killed in New York City. [24] At trial, Wing Tsang was not called to testify when it became apparent that he would assert his Fifth Amendment rights because he was not given immunity by New York State authorities regarding crimes for which he was being prosecuted.

We need not decide the factual issue of whether the Commonwealth disclosed the statement at trial because we conclude that, even assuming non-disclosure, Appellant has failed to demonstrate a violation of *Brady*. [25] Ultimately, the ques-

23. The statement actually refers to "Wayne," which apparently is a nickname for Appellant.

24. The testimony suggests that the visit by Wing Tsang to the owner of the Ho Sai Gai was an attempt by the leaders of the Flying Dragons to make a scapegoat of Wong Kin Fung/Kwa Jai because he had been killed in an unrelated event.

25. The parties dispute when the Commonwealth disclosed the statement. The Commonwealth contends that it was enclosed with other discovery material in a pre-trial letter from ADA Fisk to defense counsel. Defense counsel, however, testified at the PCRA hearings that the statement was revealed to him mid-trial prior to the attempted presentation of Wing Tsang's testimony. He averred that when he viewed it mid-trial, he was shocked and considered it a devastating piece of evidence against his client because it included an alleged confession to the shooting by Appellant. N.T., 4/4/00, at 359–60. Moreover, trial counsel noted that at the time he received this statement during trial he had not been informed that Janice Wong had previously identified Wong Kin Fung/Kwa Jai as one of those involved in the crime, and thus presumably did not recognize the significance of the

tion turns on the materiality of the statement. The statement has exculpatory value that could have led to an alternative defense theory of the case given that counsel could have attempted to develop a defense based on Wing Tsang's assertion that he and another Flying Dragons leader named Kwa Jai as the shooter, thus potentially clearing Appellant of direct liability for the murder. This theory, however, conveniently ignores the first half of the statement that indicates that Appellant confessed to Wing Tsang in great detail regarding his role as the shooter. Accordingly, the Commonwealth argues that the statement of Wing Tsang was not exculpatory, but instead, as initially noted by defense trial counsel, devastating to Appellant's case. Regardless of when the statement was revealed, we agree with the Commonwealth that the statement, as a whole, was not exculpatory, and therefore does not trigger the protections of *Brady*.

D. *Washington D.C. reports implicating Kwa Jai in crime*

 Appellant also asserts *Brady* violations regarding various reports from the Washington D.C. police regarding this case, and the parties again contest whether and when the documents were disclosed. Based in part on the information in Entry 149 discussed previously, the Philadelphia police contacted the Washington, D.C. police, who sent photos of an individual named John (SoPo) Lee whom the Washington Police believed had the nickname "Bad Boy." Janice Wong and Phong observed the photos, but did not identify him as being involved in the crime. Washington D.C. authorities also supplied Philadelphia detectives with several reports investigating gang-related activity in Washington, D.C., which named Kwa Jai and Benson Luong, and linked the two to the Flying Dragons. Other documents noted that Wong Kin Fung and SoPo Lee had been stopped together and identified as being involved in the Flying Dragons. On June 5, 1984, Washington D.C. police interviewed another Flying Dragon member tied to Benson Luong. The individual identified Wong Kin Fung

assertion in the later part of the statement that Kwa Jai had been the assailant. N.T., 4/4/00, at 363–64.

as Kwa Jai and stated that he did not hear Wong Kin Fung/Kwa Jai admit to shooting the victim in this case but did hear him say, "I did a case in Philadelphia, now I have to lay low for a while." Appellant's Supplemental Submission of *Brady* Material, Exhibit G.

Assuming *arguendo* that the Commonwealth did not disclose the documents, Appellant nonetheless is not entitled to relief because the documents are not exculpatory. Instead, the documents merely corroborated that Kwa Jai was a member of the Flying Dragons, associated with Benson Luong, and was involved in this crime. Thus, nothing in these documents in any way exonerates Appellant from his role in this crime, or as the shooter.

### E. *Officer Scanzello's relationship with Jade Wong*

■ Appellant's next *Brady* claim relates to the revelation that Office Scanzello had a romantic relationship with Jade Wong within the year before her death, a relationship that the Commonwealth failed to disclose. Officer Scanzello testified that he had disclosed to ADA Fisk prior to trial that he had had a relationship with the victim but that Fisk saw no need to disclose the information, and instructed Scanzello to tell the truth if asked. He also acknowledged that he testified at trial that he knew the Wong family prior to the murder. N.T.(PCRA), 4/7/00, at 855–58.

At the PCRA hearing, trial counsel stated that he had not been informed of Officer Scanzello's prior romantic relationship with the victim, and would have used that information to suggest bias and a possible explanation for a change in Scanzello's testimony concerning whether he could or could not see Appellant. N.T.(PCRA), 4/4/00, at 370–72. Apparently, Officer Scanzello in his original statement asserted that, based on the seating arrangement of the three men, he clearly saw the faces of two individuals, but that he did not see the face of the other individual, who would have been Appellant. At trial, however, he testified unequivocally that he saw Appellant at the restaurant. Before the PCRA court, trial defense counsel stated, "I also knew that there were two other

officers in that restaurant that evening, . . . neither of which were willing to come forward and testify at that trial, and I wondered why the other two officers weren't in court at the time when he was willing to do so." N.T.(PCRA), 4/4/00, at 397.

The Commonwealth contends that this information does not exonerate the Appellant, nor does it constitute impeachment evidence, as it does not provide the officer with a reason to be biased toward misidentifying Appellant.

We agree that the relationship was not revealed to trial counsel and we accept trial counsel's suggestion that the information could have been used to suggest that Officer Scanzello had a bias toward securing a conviction for the crime in order to provide the family of his former girlfriend with closure. We, however, hold that prejudice did not result from the non-disclosure because Officer Scanzello already testified at trial to having a relationship with the family prior to the murder. Thus, any arguable bias in favor of securing a conviction could have been pursued at trial based on his friendship with the family.

### F. Statements of Kenny Kong, Benny Eng, and Herbert Leo

Although Appellant contends in his original brief to this Court that three additional statements were not disclosed; in his reply brief, he admits that the statements of Kenny Kong and Benny Eng were disclosed prior to trial. Reply Brief at 4. Therefore, no *Brady* violation can result from these statements. The final of these three statements was from one Herbert Leo. Mr. Leo was a member of one of the Flying Dragons' rival gangs. All his statement disclosed was that he believed that members of the Flying Dragons committed the murder of Jade Wong. Clearly, while it is not clear the statement is especially inculpatory, it is not exculpatory; and therefore is not entitled to *Brady* protection.

### G. Benson Luong's statement

Appellant claims that Benson Luong, the Third Man, provided a statement upon his arrest that indicated, "it was Kwa Jai who led the criminal acts. He threatened the victim, put a gun to her head, and shot her." Brief at 20. The document provided in support of his assertion, Supplemental Submission at Exhibit G, however does not include the cited statement and instead provides:

Then Kwa Jai and [Appellant] went into the kitchen. Then I heard Kwa Jai call my name and I went toward the kitchen. When I got near the kitchen I heard a shot and when I got there I seen [sic] her on the floor with the phone. I got scared and ran away."

Statement of Benson Luong, 4/20/89, at 3. The statement also reveals evidence that both Kwa Jai and Appellant had guns because "they were gangsters and had guns all the time." Statement of Benson Luong, 4/20/89, at 3. Accordingly, Appellant's *Brady* claim based on Benson Luong's statement fails for two reasons. First, the statement could not have been disclosed prior to trial given that Benson Luong was not arrested and did not provide the statement until after Appellant's trial. Moreover, this statement does not exonerate Appellant from the role of shooter, but rather places Appellant in the kitchen with a gun at the time of the shooting. Accordingly, this claim fails.

Appellant references elsewhere in his brief that Benson Luong provided different testimony at Ah Thank Lee's trial, implicating Kwa Jai as the shooter. However, non-disclosure of testimony at Ah Thank Lee's trial cannot constitute a *Brady* violation, because it did not exist at the time of Appellant's trial given that Ah Thank Lee was tried after Appellant.

### H. Statement of Kwa Jai's brother

Appellant's next *Brady* claim also fails. Appellant asserts that Philadelphia police received a statement from Kwa Jai's brother that Kwa Jai traveled to Georgia soon after

▆▆▆▆▆▆▆▆▆

the murder, which Appellant suggests indicates Kwa Jai's attempt to avoid prosecution. In support, Appellant cites to his Supplemental Submission of *Brady* Material at Exhibit G. Upon review, however, Exhibit G does not contain a statement given by Kwa Jai's brother. Additionally, even if the statement does exist and was not disclosed by the Commonwealth, the alleged statement does not benefit Appellant as it merely corroborates Kwa Jai's involvement in a crime, without any discussion of whether the crime from which he was fleeing was first-degree murder, second degree murder, or robbery. As with other pieces of information not disclosed, this statement would clearly result in a *Brady* violation as to Ah Thank Lee, but does not have a similar exculpatory effect for Appellant, because it does not militate against Appellant's involvement in the crime or his identity as the shooter.

## I. *ADA Fisk's notes*

▆▆ At some point in the investigation, handwritten notes were drafted on ADA Fisk's stationery. The notes refer to "Bad Boy's" (Kwa Jai's) death, Ah Thank Lee's joining the gang four years prior to the note, and a reference to "Book Case," an individual in Washington, D.C. who was friends with "Bad Boy" and "told you Bad Boy did killing." The Commonwealth observes that Appellant failed to demonstrate that the prosecutor's notes were not provided during discovery or alternatively cite any precedent requiring discovery of a prosecutor's personal notations, especially when the notations relate merely to unsubstantiated rumors.

Appellant fails to provide any citation that the personal notations of a prosecutor are discoverable evidence. Instead, we note our case law does not provide a general right for defendants to review the Commonwealth's files. *See Counterman*, 719 A.2d at 297. Moreover, the evidentiary value of this note is questionable, given that there is no indication who "Book Case" is. Accordingly, we conclude that no relief is due as a result of this minimal, undated, unsigned notation as it is not material evidence that could have affected the outcome of the trial.

*J. Cumulative effect-guilt phase*

 While we have determined that no single statement constituted a *Brady* violation necessitating either a new trial or a new penalty phase, we must consider the evidence in sum, for while one piece of information may be incomprehensible or insignificant on its own, its relevance may be substantial when combined with other evidence. *See Kyles,* 514 U.S. at 421, 115 S.Ct. 1555 (asserting "the established rule that the state's obligation under [*Brady* ], to disclose evidence favorable to the defense, turns on the cumulative effect of all such evidence suppressed by the government"). Although generally the cumulative impact of meritless *Brady* claims cannot be grounds for relief, we recognize the possibility that one piece of non-disclosed evidence may not be facially exculpatory on its own but its exculpatory merit may be revealed through the disclosure of other documents.

Essentially, Appellant argues that the cumulative effect of the information relating to Wong Kin Fung/Kwa Jai's involvement in the crime undermined the Commonwealth's theory of the case and, most significantly, the credibility of the witnesses against Appellant, given that these statements identified Ah Thank Lee, who has since been cleared of involvement in the crime. Critical to Appellant's argument is the lack of direct evidence establishing which of the three men involved in this case shot Jade Wong. Appellant argues that Janice Wong heard the gunshot, saw him exiting the restaurant from the vicinity where she heard the shot, but did not see who actually fired the killing shot. N.T.(Jury), 1/26/88, at 66. Similarly, Phong Ngo identified Appellant as one of the two men who had guns earlier in the encounter and testified that he saw an arm covered in a green military jacket, holding a gun, but could not shed any additional light on who killed Jade Wong. N.T.(Jury), 1/27/88, at 21. Given that all three men were wearing similar jackets, Appellant asserts that the shooter could have been any of the three men, or at least, either of the two with guns. Appellant argues that the lack of an eyewitness to the killing makes the credibility of Janice Wong's testimony crucial. Accordingly, if Appellant had been aware

of Janice Wong's identification of both Ah Thank Lee and Kwa Jai as the first man, he could have used this material discrepancy to impeach Janice Wong's memory and powers of observation regarding her averment that Appellant was the shooter, rather than a mere accomplice. This doubt, according to Appellant, could have resulted in the jury imposing a conviction of murder in the second degree, thus preventing imposition of a death sentence.

Conversely, the Commonwealth argues that the information relating to Kwa Jai, which was exculpatory to Ah Thank Lee, had no impact on Appellant's case. The Commonwealth notes that Janice Wong never identified anyone's photograph other than Appellant as the shooter and that many of the other statements claimed to be exculpatory in fact name Appellant as one of the assailants or connect him to the Flying Dragons, Wong Kin Fung/Kwa Jai, or Benson Luong. Thus, according to the Commonwealth, none of the allegedly withheld evidence was reasonably likely to have led to a finding that Appellant was not the shooter, a finding which could have precipitated a change in the degree of guilt.

We conclude that Appellant's claims fail to meet the standard set for granting a PCRA defendant relief under *Brady*. Relief is only due when a PCRA defendant demonstrates that the alleged *Brady* violations so undermined the truth determining process that no reliable adjudication of guilt or innocence could have occurred. *Copenhefer*, 553 Pa. 285, 719 A.2d 242. Under the facts of this case, we conclude the cumulative effect of the non-disclosed evidence does not undermine the determination of guilt in Appellant's case. We acknowledge that Appellant's most compelling claim is that trial counsel could have challenged Janice Wong's ability to identify accurately Appellant as the shooter in light of Janice Wong's conflicting identifications of the First Man, combined with the notations implicating Wong Kin Fung/Kwa Jai as the shooter. However, as we have noted, the documents implicating Wong Kin Fung/Kwa Jai as the shooter were not discoverable at trial or were internally inconsistent. Thus, the claim devolves to the failure to disclose Janice Wong's conflicting identification, which we already rejected as not prejudicial in this case,

as contrasted with the case of Ah Thank Lee, where the misidentification called into question any evidence placing Ah Thank Lee at the crime scene. Accordingly, we deny Appellant relief based upon the cumulative effect of his guilt phase *Brady* claims.

### K. Cumulative effect-penalty phase

■ Appellant also claims if the jury determined that Kwa Jai was the shooter, under *Commonwealth v. Lassiter,* 554 Pa. 586, 722 A.2d 657, 661–62 (1998), Appellant would not be subject to two of the charged aggravators: 42 Pa.C.S. § 9711(d)(6) (commission of murder while in perpetration of a felony) and § 9711(d)(7) (creation of grave risk of death to another person in addition to the victim, in this case Phong). Moreover, Appellant contends that the non-disclosed evidence could have triggered the jury to find mitigating circumstances because the defendant's participation in the homicidal act was relatively minor, 42 Pa.C.S. § 9711(e)(7), and because the jury could have considered any lingering doubts regarding Appellant's role in the crime, 42 Pa.C.S. § 9711(e)(8)(catch all mitigator). Appellant notes that the proper analysis in a case where the jury found no mitigating circumstances is whether "the relevant mitigation evidence may have been enough to have one juror find a mitigating circumstance, at which point the jury would have had to weigh the mitigating circumstance against the aggravating circumstances." *Commonwealth v. Rush,* 576 Pa. 3, 838 A.2d 651, 661 (2003).

The Commonwealth claims that this argument fails for three reasons. First, the Commonwealth reasserts its argument that the information was not exculpatory evidence and was consistent with Appellant's role as the shooter, which would not contradict the aggravating circumstances. Secondly, citing our decision in *Commonwealth v. Spotz,* 587 Pa. 1, 896 A.2d 1191, 1239 (2006), the Commonwealth notes that *Lassiter* was not decided until after the defendant's trial and does not apply retroactively.[26] Finally, the Commonwealth

---

26. The Commonwealth notes that in *Lassiter* a plurality of the Court held that the aggravating circumstance only applied to the individual who personally killed the victim.

observes that the jury found two additional aggravators and found no mitigating circumstances, such that a sentence of death would be required regardless.

For the reasons stated in relation to Appellant's cumulative guilt phase claims, we cannot grant Appellant penalty phase relief based upon the cumulative effect of the allegedly nondisclosed documents because the conflicting identifications would not have altered Janice Wong's identification of Appellant as the shooter when the other evidence either inculpated Appellant as the shooter or was not discoverable at the time of trial. Accordingly, we deny relief based on the cumulative effect of Appellant's penalty phase *Brady* claims.

## V. *Challenge to Accomplice Liability Instruction*

In his next claim, Appellant seeks a new guilt phase trial based on the trial court's allegedly erroneous instructions to the jury regarding accomplice liability and the specific intent to kill. Appellant claims that the instruction given impermissibly failed to inform the jury that in order to convict Appellant of first-degree murder as an accomplice they would still have to conclude that he possessed the requisite specific intent to kill. Appellant finds fault with the following portion of the instruction:

> It will be your duty in this case to determine whether Jade Wong died as a result of a gunshot wound inflicted upon her by the defendant *or whether the defendant was an accomplice of a person who actually inflicted the gunshot wound*
> . . . .
>
> * * * *
>
> Thus, in order to find the defendant guilty of murder in the first degree, you must find that the defendant caused the death of another person, *or that an accomplice caused the death of another person. Thereafter, you must determine if the killing was intentional.*

Brief for Appellant at 45, (emphasis in original, quoting N.T.(Jury), 2/1/88, at 28, 31–32).

██ Initially, Appellant must demonstrate that the issue was neither previously litigated nor waived. While the PCRA court concluded that the issue was previously litigated, we reject this conclusion. On direct review, this Court considered whether "trial counsel failed to request an instruction clearly indicating that the Commonwealth had the burden to prove malice and intent to kill beyond a reasonable doubt because without such a charge, the burden shifted to appellant to disprove malice or intent to kill." *Ly*, 599 A.2d at 619. Clearly, the question presented on direct review did not involve the question currently before the Court concerning the trial court's potential error in instructing on the requisite state of mind for murder in the first degree in situations involving accomplice liability.

We next consider whether the issue has been waived due to the failure to object to the instructions at trial and appellate counsel's failure to claim trial counsel ineffectiveness. Appellant offers two justifications for review. First, Appellant claims that the doctrine of relaxed waiver that existed for capital cases at the time of his trial and when he filed his first PCRA petition should be applied to his case and allow him to revive claims that otherwise would be deemed waived. *See Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385, 393–404 (2003) (eliminating relaxed waiver in capital appeals). Appellant fails to acknowledge that even when the relaxed waiver rule applied, it was a discretionary rule that did not mandate this Court's review of waived issues. *See Commonwealth v. Williams*, 594 Pa. 366, 936 A.2d 12, 25 (2007). Recognizing the weakness of his argument, Appellant also couches his claim in terms of ineffectiveness for failure to preserve what he contends is a meritorious issue. We will address the issue under the rubric of ineffectiveness of counsel.[27]

---

**27.** Given that we determine that the jury instructions were not erroneous, we hold that Appellant's claims would fail regardless of whether they were asserted as trial court error under the relaxed waiver rule or ineffectiveness of counsel.

As with any claim of ineffective assistance of counsel, Appellant must prove that the underlying claim has arguable merit, that counsel did not have a reasonable basis for his or her actions or inaction, and that the defendant was prejudiced by the action or inaction of counsel. *Pierce,* 515 Pa. 153, 527 A.2d 973. Appellant fails to meet his burden if he does not prove each element, including the arguable merit prong, which we find deficient in this case. *Collins,* 957 A.2d at 245.

In addressing the arguable merit prong, Appellant asserts that the charge provided impermissibly diminished the prosecution's burden of proof and thus deprived him of due process of law by allowing the jury to convict him of murder in the first degree based on his accomplice's specific intent to kill, without a determination that Appellant himself possessed the specific intent to kill. He argues that the language used in this case is similar to that given by the same trial court judge in *Commonwealth v. Huffman,* 536 Pa. 196, 638 A.2d 961 (1994), where this Court reversed.[28] Moreover, Appellant argues that the charge in this case fails to satisfy the requirements of *Commonwealth v. Simpson,* where we held that specific intent to kill should be "elevated above principles of conspiratorial liability," and that "to be guilty of first degree murder, each co-conspirator must individually be found to possess the mental state necessary to establish first degree murder—the specific intent to kill." *Simpson,* 562 Pa. 255, 754 A.2d 1264, 1274 (2000).

Appellant argues that the error was compounded by the instruction regarding conspiracy to commit robbery, which provided that Appellant could be convicted of all natural and probable consequences occurring in furtherance of the com-

**28.** The Jury Instruction in *Huffman* provided:

Thus, in order to find a Defendant guilty of murder in the first degree, you must find that the Defendant caused the death of another person, or that an accomplice or co-conspirator caused the death of another person. That is, you must find that the Defendant's act or the act of an accomplice or co-conspirator is the legal cause of death of [the victim], and thereafter you must determine if the killing was intentional.

*Huffman,* 638 A.2d at 962.

mission of the robbery, without separately specifying that for murder, the jury must find a specific intent to kill. In support of this argument, Appellant relies on federal precedent in *Bronshtein v. Horn*, 404 F.3d 700, 712 (3d Cir.2005), in which the Court of Appeals found fault even when the instruction provided a proper accomplice liability instruction. The court in *Bronshtein* concluded that the jury could have concluded that the conspiracy charge provided a separate avenue for conviction that did not require demonstration of the defendant's specific intent to kill. However, the court did not grant a new trial because the defendant was convicted of conspiracy to murder, which also required a finding of the defendant's specific intent to kill. Appellant distinguishes *Bronshtein* by noting that in this case Appellant was convicted of conspiracy to commit robbery, not murder, which did not involve the element of specific intent to kill.

Conversely, the Commonwealth urges this Court to conclude that Appellant's claim regarding accomplice liability is frivolous because Appellant was the principal actor. It asserts that Appellant was identified at trial as the principal, not the accomplice, with respect to the murder, based on testimony of Janice Wong. N.T.(Jury), 1/26/88, 66–72. Accordingly, even if the instruction was defective, the Commonwealth claims it could not have affected the verdict.

Additionally, the Commonwealth asserts that the accomplice liability instruction was not erroneous, but instead provided the jury with the statutory definition of first degree murder and emphasized that Appellant could not be convicted of first-degree murder unless he personally possessed the specific intent to kill. The Commonwealth notes that the instructions required the jury to find that the "defendant" had the specific intent to kill, and observes that Appellant was the only "defendant" in the case, given that he was tried separately from his co-conspirators.[29]

29. Appellant refutes the Commonwealth's reliance on the use of the term "defendant" in the instructions, noting that in other parts of the instructions, the trial court used the terms defendant and accomplice interchangeably.

314

In addressing challenges to jury instructions, we consider the challenged portions in light of the entire instruction, *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 314 (1999), and we acknowledge that trial courts have broad discretion in phrasing the charge so long as the law is clearly, adequately and accurately described, *Commonwealth v. Johnson*, 572 Pa. 283, 815 A.2d 563, 587 (2002).

Upon initial review of Appellant's excerpted language, it appears that *Huffman* would compel relief; however, Appellant omits crucial language in the instruction. In full, the trial court's instructions provided as follows:

> It will be your duty in this case to determine whether Jade Wong died as a result of a gunshot wound inflicted upon her by the defendant or whether the defendant was an accomplice of a person who actually inflicted the gunshot wound *resulting in the death of Jade Wong; and if so, whether such killing amounted to murder of the first degree, murder of the second degree, murder of the third degree or voluntary manslaughter*

> \* \* \* \*

> *Now, what is murder of the first degree? The Act of Assembly or statute under which defendant is being tried expressly defines what is murder of the first degree. This statute, which is known as the Crimes Code ... provides verbatim or word-for-word as follows: "Murder of the first degree: A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing."* Thus, in order to find the defendant guilty of murder in the first degree, you must first find that the defendant caused the death of another person, or that an accomplice caused the death of another person. And thereafter, you must determine if the killing was intentional.

> \* \* \* \*

> *Therefore, in order to find the defendant guilty of murder in the first degree, you must find that the killing was a willful, deliberate and premeditated act. You must ask*

*yourselves the question did the defendant have the willful, deliberate and premeditated, specific intent to kill at the time of the killing.*

N.T.(Jury), 2/1/88, at 28, 31–32 [30] (italics added to highlight language omitted by Appellant). Appellant, however, cites only the non-italicized portion of the instruction in his brief to this Court, and ignores the final sentence relating to the question of whether "defendant" had the specific intent to kill at the time of the killing. The trial court further instructed on what constitutes a specific intent to kill, including the relevance of the use of a deadly weapon upon a vital part of the body and the elements of the other degrees of murder, which do not include the demonstration of defendant's specific intent to kill. N.T.(Jury), 2/1/88, at 33–39.

Additionally, the court instructed on accomplice liability:

Under the law of Pennsylvania, you may find the defendant guilty of a crime without finding that he personally engaged in the conduct required for the commission of the crime. A defendant is guilty of a crime if he is an accomplice of another person who commits that crime. A defendant does not become an accomplice merely by being present at the scene or knowing about a crime. He is an accomplice if, with the intent of promoting or facilitating the commission of the crime, he solicits, commands, encourages or requests the other person to commit it, or aids, agrees to aid, or attempts to aid the other person in planning or committing it.

N.T.(Jury), 2/1/88, at 18–19.

After the jury had deliberated for approximately one hour, it presented the trial court with a question: "Definition of murder one and murder two." N.T.(Jury), 2/1/88, at 47. The court responded by providing a very similar definition as that provided above. N.T.(Jury), 2/1/88, at 48. The court then reiterated the requirements of an intentional killing and restated that "You must ask yourselves the question did the

---

**30.** While we acknowledge that there were gaps in sequence between the passages set forth above and below, we, of course, review the totality of the charge. *Pursell*, 724 A.2d at 314.

defendant have the willful, deliberate and premeditated specific intent to kill at the time of the killing." N.T.(Jury), 2/1/88, at 48.

Considering the entirety of the relevant jury instructions, we conclude that the trial court properly stated the law and instructed on the requirement that the jury find that Appellant, as "the defendant," had the specific intent to kill, regardless of whether the jury concluded he fired the fatal shot or whether he was an accomplice of the person who fired the fatal shot. We considered nearly identical instructions in *Commonwealth v. Cox*, 581 Pa. 107, 863 A.2d 536, 550 (2004)("The aforementioned instructions, when reviewed in totality, clearly and accurately indicated to the jury that, to find Appellant guilty of murder in the first degree, it was necessary that they find he possessed the requisite specific intent to kill.").[31] Over the thoughtful dissent of Justice Saylor and Former Justice Nigro, this Court found the instructions sufficient to inform the jury of the necessity of finding that the defendant had the specific intent to kill even under a theory of accomplice liability. Accordingly, we find no error in the jury instructions in this case and thus conclude

---

**31.** In *Cox*, this Court considered a similar claim where the defendant isolated one portion of the instructions. The challenged portion of the instructions provided:

> Thus, in order to find the defendant guilty of murder in the first degree, you must first find that the defendant caused the death of another person, or that an accomplice caused the death of another person. That is, you must find that the death of the victims in this case, Tina Brown and Evelyn Heath Brown, would not have occurred but for the defendant's acts, or the acts of the defendants' or acts of the defendant's accomplice, and, thereafter you must determine if the killing was intentional.

*Id.* at 550 (citations omitted). The Court, however, took note of the more extensive instructions on accomplice liability and first-degree murder. As in this case, the trial court in *Cox* explained the necessity of the specific intent to kill:

> Therefore, in order to find the defendant guilty of murder of the first degree, you must find that the killing was a willful, deliberate and premeditated act.
>
> You must ask yourselves the question did the defendant have the willful, deliberate, and premeditated specific intent to kill at the time of the killing.

*Id.* at 550 (citations omitted).

that trial and appellate counsel were not ineffective for failing to raise a non-meritorious claim.

### Penalty Phase Claims

### VI. Failure to Conduct Mitigation Investigation

Next, Appellant asserts that trial counsel was ineffective for failing to investigate Appellant's background, history, and character, arguing that his counsel's preparation was non-existent, "one tantamount to a complete abdication of the role of advocate and an abandonment of his client." Brief for Appellant at 51. Appellant notes that our Court and the United States Supreme Court have required capital counsel to conduct a reasonable investigation, without which there can be no reasonable strategic basis to forego mitigation. *Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Commonwealth v. Zook,* 585 Pa. 11, 887 A.2d 1218, 1233–35 (2005).

The PCRA court addressed the issue by reference to our analysis when this case was before us on direct appeal, where we concluded that "counsel's presentation of mitigating circumstances was reasonably intended to effectuate appellant's best interests," and held that Appellant failed to identify any evidence that would have changed the penalty phase outcome. PCRA Ct. Slip Op. at 10.

Initially, we reject the Commonwealth's argument that the mitigation issue has been previously litigated by this Court on direct review. The argument now raised addresses the failure to conduct a proper investigation, where the question on direct appeal challenged the failure to present specific items of mitigation. Nevertheless, we are constrained to deny relief without reaching the merits because Appellant has failed to layer his ineffectiveness of counsel claim by asserting direct appellate counsel's ineffectiveness for failing to raise the ineffectiveness of trial counsel's mitigation investigation on direct appeal.

As noted, current PCRA counsel filed a Supplement to the PCRA Petition to add layered claims of ineffectiveness pursu-

ant to *McGill.* Surprisingly, Appellant specifically exempted from his layered claims the claims relating to the failure of trial counsel to conduct a proper mitigation investigation. He argues that the claim is not record based and thus could not have been pursued by appellate counsel "who is without funds and resources to conduct the necessary investigation." Brief for Appellant at 52, n.27, 79, n.42; Final Amended Petition at 11, n.5.[32] Recognizing the potential error, current PCRA counsel (New Counsel) attempts to claim his own ineffectiveness for failing to layer the claim in the reply brief to this Court.

The Commonwealth preemptively notes that we foreclosed the possibility of Appellant amending his claim by layering his ineffectiveness argument in a reply brief to this Court, citing our decision in *Commonwealth v. Basemore:*

> To avoid any waiver associated with its own representation, [counsel] raises, for the first time in its reply brief, the argument that it was ineffective and thus the issues it now raises can nevertheless be addressed. A reply brief, however, is an inappropriate means for presenting a new and substantively different issue than that addressed in the original brief. In addition, a claim of ineffectiveness on the part of [counsel] could have been raised in the PCRA court, in [appellant's] statement of matters complained of on appeal, or in his original brief. Since this did not occur, any allegation of error in this regard is waived.

*Commonwealth v. Basemore,* 560 Pa. 258, 744 A.2d 717, 726–727 (2000) (citations omitted). We therefore are bound to conclude that the attempt made in the reply brief to assert and layer properly current PCRA counsel's ineffectiveness for failing to layer direct appellate counsel's ineffectiveness must fail, despite the potential merits of the underlying claim of

**32.** Appellant also claims in his reply brief that he did layer his claim in the Final Amended Petition because he asserted "direct appellate counsel failed to identify and present/preserve the claims raised in [Appellant's] previous PCRA petitions and those raised herein." Final Amended Petition at 1. However, we refuse to read this statement as a layered claim regarding the failure to conduct a mitigation investigation when both the Final Amended Petition and the initial brief to this Court exempt the mitigation investigation question from the layered analysis.

trial counsel ineffectiveness for failure to investigate mitigating factors.[33] Accordingly, we find the issue waived.

### VII. Lack of Notice of Aggravating Factors[34]

Appellant argues that he was deprived of effective assistance of counsel by counsel's failure to request and re-

**33.** Appellant contends that the extent of his counsel's investigation of his upbringing was to speak with someone he thought was Appellant's sister, even though the individual was actually his brother's girlfriend who had not known him during his difficult upbringing. N.T.(PCRA), 4/4/00at 312–15. Indeed, counsel only spoke to Appellant "a couple times" before trial and apparently did not ask Appellant if he could add anything helpful to his penalty phase defense. N.T.(PCRA), 4/4/00, at 374–77. He notes that because of the lack of investigation, counsel was unable to present any evidence of Appellant's mental health, family, occupational, education, or social history. Appellant asserts that the following information relevant to mitigation would have been uncovered through diligent research and indeed was uncovered and presented at the PCRA hearing:

(1) Victimization and abandonment by his father who severely abused his mother in front of Appellant, who drank and became violent, and who beat and abused the children and especially Appellant (including hanging him by his wrists during beatings at age 6);
(2) An estranged relationship with his mother, including his being the tenth of thirteen siblings in a home where his mother was overwhelmed and not emotionally available to him;
(3) Exposure to atrocities of the war in Vietnam at a young age, including discrimination, persecution, impoverishment, food deprivation, bombing of his hometown, witnessing a friend die when a landmine exploded while playing hide and seek with Appellant;
(4) The impact of the communist rule, including the communists' takeover of the family business, the denial of his opportunity to get an education; the violence from pirates during his escape from Vietnam;
(5) Hardships upon arriving in the United States including violence against him, feeling the need to join a gang to protect himself, using drugs to cope with his transition to the United States;
(6) Positive acts of Appellant including organizing a group of people to flee Vietnam by boat, working to support his brothers once they arrived in America, encouraging his brother .to get an education, attempting to obtain a GED himself while incarcerated; and providing care for his young son.

See Brief for Appellant at 57–59, rephrased and reorganized for clarity.

Appellant presented at the PCRA hearing testimony from his brother, his sister, and his sister-in-law, in addition to a mitigation specialist, that confirmed in gruesome detail the hardships that Appellant faced as a child. The siblings also testified to trial counsel's failure to ask for any assistance relating to mitigation issues. The siblings confirmed that they were present in Philadelphia at the time of the trial and would have been willing to testify on Appellant's behalf.

**34.** Appellant argues that the following four issues all fall under the relaxed waiver rule, which existed at the time of trial and at the time of

ceive advance notice of the aggravating factors that the Commonwealth intended to present during the penalty phase. N.T.(Jury), 2/1/88, at 132. Appellant relies upon the High Court's decision in *Lankford v. Idaho,* 500 U.S. 110, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991), where the Court held that due process requires that the defense be provided pre-hearing notice of the intent to seek the death penalty and of the intended aggravating factors. He further argues that there can be no rational basis for foregoing a claim under which the United States Supreme Court has determined he would be entitled to a new penalty hearing. Additionally, he asserts that the prejudice is clear because he remains on death row.

Turning to the layered claim of ineffectiveness of direct appellate counsel for failing to raise trial counsel's ineffectiveness, Appellant asserts that direct appellate counsel should have been aware of the decision in *Lankford,* given that *Lankford* was decided while Appellant's Petition for Reargument for denial of relief on direct appeal was being considered by this Court, and thus the decision would have applied because it was decided while direct review of Appellant's case was pending. He asserts that there can be no rational basis for foregoing a claim that would justify a new trial under United States Supreme Court precedent, and the prejudice according to Appellant is indisputable for the same reason.

Acknowledging that Pa.R.Crim.P. 802 now requires notice to the defendant of the aggravating circumstances to be

the filing of his initial PCRA petition and which allowed this Court to consider claims of trial court error on direct appeal despite trial counsel's failure to raise the issues at trial. Accordingly, if the current claims fell under the relaxed waiver rule, Appellant argues, there is no need to layer the claims to include the ineffectiveness of direct appellate counsel for not raising trial counsel's effectiveness on direct review. We note, however, that even if the relaxed waiver rule applied to these claims, the rule never provided a guarantee that this Court would hear the otherwise waived issue, but only that we had the discretion to hear it. *Williams,* 936 A.2d at 25. Moreover, the question of the application of relaxed waiver is moot given our denial of relief on the merits of Appellant's claims.

alleged, the Commonwealth observes that the notice was not required at the time of Appellant's trial. Moreover, the Commonwealth asserts that *Lankford* is inapplicable because that decision applies to situations where the defendant is actively misled into thinking that the death penalty was not being considered as a punishment, which was not the situation in the case at bar. In support, the Commonwealth cites *Commonwealth v. Pirela*, 556 Pa. 32, 726 A.2d 1026, 1031, n. 9 (1999) which held that *Lankford* was inapplicable in a case where the defendant knew that the court was considering a death sentence.

Moreover, the Commonwealth asserts that Appellant was not prejudiced by his counsel's decision not to raise the *Lankford* issue. To be prejudiced, Appellant would have to demonstrate that it would have been reasonably likely that the provision of notice of the aggravating circumstances would have allowed the defense to dissuade the jury from finding the three aggravators it found: that Appellant committed the murder while in the perpetration of a felony, he knowingly created a grave risk of death to another person in addition to the victim, and he had a significant history of felony convictions involving the threat of violence. The Commonwealth observes that Appellant fails to allege how the notice of these charges would have allowed his counsel to mount a successful defense, citing *Commonwealth v. Carter*, 537 Pa. 233, 643 A.2d 61, 73–74 (1994), where this Court rejected a similar claim.

In addition to agreeing that *Lankford* is inapplicable because the defense was fully aware that the Commonwealth was seeking the death penalty against Appellant, we also conclude that no amount of notice of the aggravators to be sought would have allowed Appellant's counsel the opportunity to mount a defense to them. There is no dispute that the murder was committed in the perpetration of an attempted robbery, that others were placed in grave risk of death by the discharge of the weapon in the restaurant, and that Appellant had a history of felony convictions. Accordingly, as ineffec-

tiveness cannot be proven absent prejudice, we deny relief on this issue. *Collins,* 957 A.2d at 245.

## VIII. *Prosecutorial Misconduct*

 Next, Appellant asserts that he was denied effective assistance of counsel because trial counsel did not object to the comments of the prosecutor during closing argument in the penalty phase. Addressing the arguable merit prong, Appellant contends that the following remarks of the prosecutor were impermissible and inflammatory. First, he objects to the prosecutor's reference to the lack of remorse Appellant displayed when he testified for himself during the penalty phase:

> He doesn't even respect the law and order of society enough to respect the verdict of this very jury. This jury has said within the past three hours, Cam Ly, you are the man who murdered Jade Wong, at least give us a reason to spare your life. And does he? Does he at least get up and say I'm sorry for what happened? He doesn't even respect society enough to get up there and admit to you that you are right. No, he gets up there and says oh, you made a grave mistake and it wasn't me. Is that the kind of lawlessness we can afford to live with?

N.T.(Jury) 2/1/88, at125. Appellant asserts that the prosecution violated the protection of the Fifth Amendment against self-incrimination when it suggested that Appellant's life deserved to be spared only if he relinquished his claim of innocence, citing *Commonwealth v. Robinson,* 581 Pa. 154, 864 A.2d 460, 519 (2004). Moreover, he asserts that the failure to admit guilt was used as a non-statutory aggravator, which constitutes an impermissible violation of state law and his due process rights.

 Next, Appellant contends that the prosecution impermissibly invoked non-statutory aggravators in the form of Appellant's lawlessness and future dangerousness through the following two statements:

He is living in a lawless society, one that has no respect for law and order, for the way that people exist and have to expect other people to exist if we are going to be expected to all live together on one earth.

(N.T.(Jury), 2/1/88, at124).

You as a jury now know the past history of Cam Ly and the fact that he has committed violent acts on a number of occasions in the past. Will you be satisfied with the sentence of life imprisonment? Or do you believe death is necessary, ... necessary for the protection of all of us who believe in a society of law and order and a respect for others.

N. T.(Jury), 2/1/88, at 129–30. He argues that these comments regarding his lawlessness and potential future dangerousness constituted argument for non-statutory aggravators not permissible under Pennsylvania's death penalty statute.

Appellant contends that there can be no reasonable basis not to object and pursue this viable issue that allowed the jury to consider non-statutory aggravators. Moreover, he asserts that prejudice resulted from the failure of counsel to object to these comments because he was denied his privilege against self-incrimination.[35]

In response, the Commonwealth explains that a prosecutor has great latitude under Pennsylvania law to present his or her argument in the penalty phase because the presumption of innocence no longer applies. *Commonwealth v. Rompilla*, 554 Pa. 378, 721 A.2d 786, 790 (1998). Instead, a prosecutor "may employ oratorical license and impassioned argument" in favor of a sentence of death. *Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352, 365 (1995). The Commonwealth quotes our well-settled law: "[C]omments by a prosecutor do not consti-

35. Appellant also couches his claim in terms of direct appellate counsel's ineffectiveness in not raising trial counsel's failure to object during Appellant's direct appeal to this Court. As we find no merit to his claim of trial counsel ineffectiveness, we need not address the prongs of appellate counsel ineffectiveness.

tute reversible error unless their unavoidable effect was to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true penalty determination." *Freeman,* 827 A.2d at 409 (citation omitted).

Regarding the prosecution's comments about Appellant's lack of remorse and insistence of innocence, the Commonwealth contends that Appellant's Fifth Amendment right against self-incrimination could not be violated when he testified prior to the statement. Additionally, the Commonwealth asserts that the prosecution did not promote a non-statutory aggravator in the form of the denial of responsibility, arguing that the comments instead highlighted the unpersuasiveness of Appellant's attempt at mitigation. Moreover, it notes that this Court has concluded that lack of remorse can be relevant to assessing the presence of any mitigating factors. *See Commonwealth v. Chester,* 526 Pa. 578, 587 A.2d 1367, 1378 (1991).

The Commonwealth next turns to Appellant's claim that the prosecutor improperly invoked Appellant's "lawlessness." The Commonwealth asserts that the prosecutor's comments were relatively uncontroversial given that murder and extortion indeed are not in accord with the law, and concludes, "it was well within a prosecutor's oratorical license at the penalty stage to frame defendant's illegal conduct as such." Brief for Commonwealth at 57. Accordingly, the Commonwealth contends that this statement did not incapacitate the jury from weighing the evidence objectively and rendering a true penalty determination, citing *Freeman,* 827 A.2d at 402.

Regarding the alleged invocation of Appellant's future dangerousness, the Commonwealth asserts that the prosecutor did not argue for a non-statutory aggravator in the form of future dangerousness but "instead simply noted the logical significance of defendant's substantial history of violent crime and urged the jury to follow the trial court's (legally correct) instructions." Brief for Commonwealth at 58. Moreover,

addressing the question of prejudice from any potential error, the Commonwealth observes that the case did not involve a weighing process given the jury's failure to find mitigating circumstances, but rather merely involved the imposition of a death sentence upon the finding of aggravating circumstances.[36] Accordingly, the Commonwealth contends that counsel was not ineffective for failing to object to the prosecutor's statements.

Upon review, we conclude that the prosecutor's comments fell within the rubric of oratorical flair and did not invoke non-statutory aggravators. *See Freeman*, 827 A.2d at 409. As Appellant fails to demonstrate the arguable merit of the claim of ineffective assistance of counsel for failure to object to the remarks of the prosecution, we deny relief.

## IX. Jury Instruction Regarding Unanimity for Mitigating Circumstances

Appellant next asserts that the trial court's jury instructions during the penalty phase, regarding mitigation, were flawed. Appellant views the instructions as erroneously requiring the jury's unanimity on the existence of any mitigating factor:

> The sentencing code provides that the verdict must be a sentence of death if the jury unanimously find[s] at least one aggravating circumstance and no mitigating circumstance,

---

**36.** Moreover, because the claim sounds in ineffectiveness of counsel, the Commonwealth asserts that counsel cannot be deemed ineffective for failing to anticipate the United States Supreme Court's decision in *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994)(plurality), regarding the effect of a prosecutor's invocation of future dangerousness. The United States Supreme Court in *Simmons* concluded that jurors, in certain circumstances, must be told that "life means life" because of the misconception that many have regarding the effect of a sentence of life in prison.

or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstance.

N.T.(Jury), 2/1/88, at 142.

Remember again that your verdict must be unanimous; it cannot be reached by a majority vote or by any percentage. It must be the verdict of each and every one of you.

(N.T.(Jury), 2/1/88, at 146).

As I told you before, this is not done on a percentage, it must be a unanimous verdict just as you had to do in the guilt stage that you have completed.

N.T.(Jury), 2/1/88, at 150.

Appellant notes that the United States Supreme Court in *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), established that a mitigating circumstance had to be weighed against the aggravators, even if only one juror found that the mitigating circumstance existed. He claims that under *Mills*, he would have been entitled to penalty phase relief and that there can be no strategic reason to forego such "automatic" relief, especially when he claims the issues presented by appellate counsel on direct appeal lacked substantial merit. He observes that we found a similar violation in *Commonwealth v. Chambers*, in which we also concluded that a defendant suffers prejudice as a result of an instruction requiring unanimity in determination of the existence of mitigators. *Commonwealth v. Chambers*, 570 Pa. 3, 807 A.2d 872, 883 (2002) ("Clearly, Chambers suffered prejudice because the instruction could easily have confused the jury into believing that all members of the panel had to find a mitigating circumstance before weighing the aggravating and mitigating circumstances."). Appellant acknowledges that *Mills* was not decided until a few months after Appellant's trial, but claims that he was entitled to the relief provided in *Mills* because his case was on direct appeal at the time the decision was filed. He notes that the PCRA court failed to address this issue and instead merely commented that this Court on direct appeal

had "addressed defendant's death phase issues and rejected them." PCRA Ct Op at 9.[37]

The Commonwealth responds that counsel was not ineffective for failing to anticipate *Mills*, which was not decided until four months after trial. It notes that in *Commonwealth v. Holloway*, 559 Pa. 258, 739 A.2d 1039, 1047 (1999), this Court held that counsel will not be deemed ineffective for failing to request a *Mills* compliant instruction when the trial occurred prior to the decision in *Mills*. Additionally, the Commonwealth contends that this Court has approved similar jury instructions, *Commonwealth v. Laird*, 555 Pa. 629, 726 A.2d 346, 359 (1999); *Commonwealth v. Hackett*, 534 Pa. 210, 627 A.2d 719, 725 (1993), and asserts that the instructions provided in the case at bar were consistent with the dictates of *Mills* and tracked the language of the Sentencing Code in effect at the time of trial. Accordingly, the Commonwealth asserts that the instructions were proper.

We have repeatedly addressed claims under *Mills*. In *Commonwealth v. Duffey*, the Court was presented with a procedural history similar to this case, where the trial occurred prior to the United States Supreme Court's decision in *Mills*, but the direct appeal was decided after *Mills*. In that case, we definitively held that "an alleged *Mills* violation will not be available on collateral review in cases in which the alleged error occurred before the United States Supreme Court's decision in *Mills*." *Commonwealth v. Duffey*, 585 Pa. 493, 889 A.2d 56, 71 (2005). We observed, "Appellant, however, never raised or preserved a Mills claim before the trial court or on direct appeal. As such, Appellant's claim regarding Mills is waived." *Id.* Moreover, we denied the defendant's layered claim of ineffective assistance of counsel for failure to raise the *Mills* issue: "Appellant attempts to overcome waiver

**37.** Appellant also presents a claim of ineffectiveness of direct appellate counsel for failing to raise trial counsel's ineffectiveness for not challenging a jury instruction that he claims was contrary to the death penalty statute, especially when *Mills* had been decided while the case was on direct appeal. We will not address the ineffectiveness of appellate counsel because we find the Appellant's claim of trial counsel ineffectiveness fails.

by raising a layered claim of counsel's ineffectiveness. Trial counsel, however, will not be deemed ineffective for failing to anticipate a change in the law." *Id.* Accordingly, we are bound by *stare decisis* to deny relief in Appellant's case.[38]

Likewise, we conclude that the instructions given, *see supra* at 52, mirror the language in the Sentencing Code in existence at the time of trial: "[T]he verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance specified in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances." 42 Pa.C.S. § 9711(c)(1)(iv)(1988). Accordingly, as we have in prior cases, we find that trial counsel was not ineffective in failing to challenge the jury instructions as contrary to the statute.

## X. *Simmons Instruction*

 Appellant also objects to the trial court's failure to instruct that a life sentence in Pennsylvania means "life without the possibility of parole," commonly known as a *Simmons* instruction in reference to the decision of the United States Supreme Court in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994)(plurality), that concluded that jurors must be informed that "life means life" because of the misconception that many have regarding the effect of a sentence of life in prison.

**38.** We acknowledge, however, that Appellant may find relief in the federal courts on this issue. In March 2008, the United States Court of Appeals for the Third Circuit granted relief to a defendant based on *Mills* after analyzing similar jury instructions. *Abu–Jamal v. Horn,* 520 F.3d 272, 304 (3d Cir.2008); *see also, Kindler v. Horn,* 542 F.3d 70, 83 (3d Cir.2008). We respectfully note that we are not bound by decision of the Court of Appeals, that the parties have not amended their arguments to address the recent decision in *Abu–Jamal,* and that unlike the defendant in *Abu–Jamal,* Appellant has not framed his *Mills* challenge to involve an allegedly defective jury instruction form in addition to the jury instructions. Moreover, we acknowledge the observations of the Concurring Opinion that the Court of Appeals's analysis of the *Mills* issue may soon be subject to review by the United States Supreme Court. *See* Concurring Opinion at 343–44, 980 A.2d at 106.

As noted by the Commonwealth, we are bound by our precedent that requires denial of relief on the *Simmons* issue:

> [W]e have explicitly stated that our adoption of *Simmons* will not be given retroactive effect in a collateral attack upon a petitioner's sentence. In PCRA petitions such as Appellant's, the rule to be applied is the one which was applicable at the time of trial. At the time of Appellant's 1992 trial, the law of this Commonwealth specifically prohibited an instruction which would inform a jury that life means life without parole. As we do not require that counsel be omniscient, we cannot find Appellant's counsel was ineffective for failing to anticipate a change in the law. Therefore, Appellant's penalty phase counsel was not ineffective when he failed to request a "life means life" instruction.

*Commonwealth v. Santiago*, 579 Pa. 46, 855 A.2d 682, 700–01 (2004)(internal citations and quotation marks omitted); *see also Duffey*, 889 A.2d at 71.

## XI. Cumulative Effect

In his penultimate issue, Appellant contends that he is entitled to relief based on the cumulative effect of all of the errors discussed herein. In contrast, the Commonwealth cites a litany of our cases holding that "no number of failed claims may collectively attain merit if they could not do so individually." *Commonwealth v. Freeman*, 827 A.2d at 416. We agree with the Commonwealth, and summarily deny relief on this issue.

## XII. Vienna Convention

In his final claim, Appellant asserts that he is entitled to a remand to seek application of the protection of the Vienna Convention and to prove that the failure of counsel and the lower courts to secure his rights under that Convention entitles him to relief.[39] Appellant is a Vietnamese national. Ac-

---

**39.** As described by the United States Supreme Court,

The Vienna Convention was drafted in 1963 with the purpose, evident in its preamble, of "contribut[ing] to the development of friendly

cordingly, he claims that an attempt should have been made to contact the Vietnamese government in accordance with the Vienna Convention, of which the United States is a signatory nation. Specifically, he invokes Article 36, *see supra* n. 39. He signaled that at the time he filed his brief to this Court the enforceability of Article 36 was before the United States Supreme Court in *Bustillo v. Johnson, Director of the Virginia Department of Corrections*, 546 U.S. 1002, 126 S.Ct. 621, 163 L.Ed.2d 503 (2005). He requests that this Court withhold its decision pending the Supreme Court's decision in *Bustillo* to ensure the protection of his rights or remand the case for further development of the record.

Without addressing the merits of Appellant's assertions, we conclude that we cannot address the issue Appellant raised following the Supreme Court's decision in *Bustillo*, which the Court has issued in the interim. *Sanchez–Llamas v. Oregon*, 548 U.S. 331, 360, 126 S.Ct. 2669, 165 L.Ed.2d 557 (U.S.2006)(deciding the issue granted in the companion case of *Bustillo* ). In Bustillo's case, the High Court held that Virginia's rules of procedure, which resulted in the waiver of Bustillo's claim, applied to Vienna Convention claims. The Court concluded, "Bustillo cannot show that normally applicable procedural default rules should be suspended in light of the type of right he claims," *Id.* at 358, 126 S.Ct. 2669, and

relations among nations, irrespective of their differing constitutional and social systems." 21 U.S.T., at 79. The Convention consists of 79 articles regulating various aspects of consular activities. At present, 170 countries are party to the Convention. The United States, upon the advice and consent of the Senate, ratified the Convention in 1969. *Id.,* at 77.

Article 36 of the Convention concerns consular officers' access to their nationals detained by authorities in a foreign country. The article provides that "if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner." Art. 36(1)(b), *id.,* at 101. In other words, when a national of one country is detained by authorities in another, the authorities must notify the consular officers of the detainee's home country if the detainee so requests.

*Sanchez–Llamas v. Oregon*, 548 U.S. 331, 337–338, 126 S.Ct. 2669, 165 L.Ed.2d 557 (U.S.)(footnote omitted).

held "that claims under Article 36 of the Vienna Convention may be subjected to the same procedural default rules that apply generally to other federal-law claims." *Sanchez–Llamas v. Oregon,* 548 U.S. 331, 360, 126 S.Ct. 2669, 165 L.Ed.2d 557.

As in Bustillo's case, Appellant's Vienna Convention claim is waived under our procedural rules. Appellant failed to raise this claim at any prior stage in the proceedings and indeed failed to raise the issue in his statement of matters complained of on appeal. Accordingly, we find the issue waived for purposes of this appeal, *Commonwealth v. Castillo,* 585 Pa. 395, 888 A.2d 775, 779–80 (2005), and deny Appellant relief on this issue.

For the foregoing reasons, we affirm the PCRA court's order dismissing appellant's petition for post-conviction relief. We direct the Prothonotary of this Court to transmit a complete record of this case to the Governor, pursuant to 42 Pa.C.S. § 9711(i).

Justice TODD, Justice McCAFFERY and Justice GREENSPAN join the opinion.

Chief Justice CASTILLE files a concurring opinion in which Justice EAKIN joins.

Justice SAYLOR files a concurring and dissenting opinion.

Chief Justice CASTILLE, Concurring.

I join the Majority Opinion, with the exception of certain aspects of its disposition of appellant's *"Mills* claim." [1] I write to elaborate on a number of other points, and to explain my respectful disagreement with aspects of the *Mills* disposition, in particular Footnotes 37 and 38 of the Majority Opinion.

First, I would supplement the Majority's analysis of appellant's invocation of relaxed waiver as follows. Appellant invokes the doctrine with respect to some of the record-based claims of error which he did not challenge on direct appeal.

1. *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

Appellant contends that, "under the relaxed waiver doctrine that was in effect at the time of [appellant's] direct appeal (and when he filed his PCRA petition), this Court would have been 'obliged' to review claims not raised below on their merits." Appellant's Brief at 44.[2] Appellant maintains that, "because he was entitled to raise [these claims] in his direct appeal, he is entitled to raise [them] now as if on direct appeal." *Id.* (emphasis omitted). Not to afford direct relaxed waiver review now, appellant says, violates the due process rights of those who "relied" upon the doctrine. In the alternative, appellant pursues the waived claims under the derivative rubric of ineffective assistance of counsel.

The obvious initial response to appellant's argument is that he is not presently on direct appeal to this Court. Whatever appellant may have been "entitled" to demand on that direct appeal has long since passed; to the extent appellant failed to raise claims, including waived claims of trial error invoked under relaxed waiver, he has defaulted the claims here. Defaulted claims from direct review are cognizable only to the extent they are permitted under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546, which, as appellant recognizes, in this instance, requires him to prove layered claims of ineffective assistance of counsel.

More fundamentally, however, appellant's absolutist view of his relaxed waiver "entitlement" misapprehends our former doctrine. The Majority dismisses appellant's relaxed waiver argument because "[a]ppellant fails to acknowledge that even when the relaxed waiver rule applied, it was a discretionary rule that did not mandate this Court's review of waived issues." Majority Op. at 311, 980 A.2d at 86; *see also id.* at

2. This Court abrogated relaxed waiver in the PCRA context in *Commonwealth v. Albrecht*, 554 Pa. 31, 720 A.2d 693, 700 (1998), and has since reaffirmed that such abrogation applies retroactively. *See Commonwealth v. Wilson*, 580 Pa. 439, 861 A.2d 919, 928 n. 8 (2004); *Commonwealth v. Basemore*, 560 Pa. 258, 744 A.2d 717, 725–26 (2000); *Commonwealth v. Pursell*, 555 Pa. 233, 724 A.2d 293, 303 (1999); *Commonwealth v. Steele*, 599 Pa. 341, 961 A.2d 786, 834–35 (2008) (Castille, C.J., concurring). This Court later abrogated the relaxed waiver doctrine in the direct capital appeal context in *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385, 403 (2003).

319–20 n. 34, 980 A.2d at 91–92 n. 34 ("[E]ven if the relaxed waiver rule applied to these claims, the rule never provided a guarantee that this Court would hear the otherwise waived issue, but only that we had the discretion to hear it."). The Majority is correct. I would add, however, that the discretionary nature of relaxed waiver review eviscerates appellant's current claims that he is "entitled" to relaxed waiver review now and that he "relied" upon the doctrine in defaulting his claims at trial and on direct appeal. Appellant could not have justifiably "relied" upon the doctrine with respect to waived claims heretofore. *See Commonwealth v. Duffey*, 585 Pa. 493, 889 A.2d 56, 64 (2005) ("[T]his [C]ourt's relaxed waiver doctrine was discretionary, and thus, there was no guarantee that we would have analyzed [issues] under the relaxed waiver doctrine.... Accordingly, any reliance on this [C]ourt's relaxed waiver doctrine is unavailing."). Furthermore, it defies logic that a defense counsel would deliberately fail to raise a claim on direct appeal, thereby guilefully manipulating the appellate process, in "reliance" on the prospect of delayed, collateral review premised upon a discretionary doctrine. And, most importantly, there has been no proffer or proof that appellant in fact "relied" upon the doctrine in defaulting claims on direct appeal; indeed, it is highly unlikely that any defense counsel could with any candor forward such a claim.

Notably, in *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003), this Court addressed the expectations that fairly could be deemed affected by the abrogation of direct appeal relaxed waiver. We specifically stated that, "[t]his new general rule will be applied prospectively, beginning with those capital direct appeals in which the appellant's brief has not yet been filed in this Court, and is not due for thirty days or more after today's decision. It will then apply to all future capital appeals." *Id.* at 403. We reasoned as follows:

Prospective application of our new approach will avoid upsetting the expectations of capital appellants and their direct appeal counsel who have already briefed, or are in the process of briefing, their appeals in reliance upon the pros-

pect that this Court, in its discretion, might reach the merits of some of their otherwise waived claims of trial error. *Id.* Thus, *Freeman's* concern for parties' "reliance" on relaxed waiver was limited to those who had actually "relied" upon the doctrine when briefing claims to this Court. Even in *Freeman,* however, we examined the doctrine, as invoked, claim by claim, declining to reach those claims that were not appropriately subject to review. *See, e.g., id.* at 406 (declining to reach waived claim that trial court erred in its response to jury question; noting that "where the issue was joined below and appellant agreed to its resolution, we will not review the claim," even under relaxed waiver). The *Freeman* Court did not purport to recognize the type of hindsight "reliance" interest alleged by appellant here.

Next, I write to supplement the Majority's discussion of four claims involving alleged ineffective assistance of counsel: Claim V (jury instructions concerning accomplice liability); Claim VI (lack of mitigation investigation); Claim VII (lack of notice of aggravating circumstances); and Claim IX (jury instructions regarding mitigating circumstances). Taking Claim V first, the Majority correctly dismisses appellant's underlying challenge to the trial court's accomplice liability instruction, noting that this Court upheld "nearly identical instructions" in *Commonwealth v. Cox,* 581 Pa. 107, 863 A.2d 536, 550 (2004). Majority Op. at 315–16, 980 A.2d at 89. I would add that this Court more recently upheld similar instructions in *Commonwealth v. Daniels,* 600 Pa. 1, 963 A.2d 409, 430–31 (2009), where we observed, in pertinent part, as follows:

> As [*Commonwealth v. Speight,* 578 Pa. 520, 854 A.2d 450 (2004) ] makes clear, when reviewing *Huffman*[3]-type challenges, courts must follow the well-settled requirement that the challenged jury charge is to be examined in its entirety. Such an examination includes reviewing the charge to determine whether the jury was adequately apprised of the elements of first-degree murder and the related concept of specific intent to kill.

3. *Commonwealth v. Huffman,* 536 Pa. 196, 638 A.2d 961 (1994).

Thus, the Majority correctly rejects appellant's invitation to read excerpts of the trial court's accomplice liability instruction out of their full context.

Turning to Claim VI respecting mitigation evidence, appellant, as the Majority notes, expressly declined to layer this claim in his principal brief, but instead pursued it as a stand-alone claim of trial counsel ineffectiveness. Appellant explains his failure as follows:

> Here, the claim is purely that of trial counsel ineffectiveness with no need to "layer" a claim of ineffectiveness of direct appeal counsel. The failure to conduct a proper mitigation investigation is not a record-based claim and cannot be pursued by direct appeal [counsel], who is without funds and resources to conduct the necessary investigation.

Appellant's Brief at 52 n.27. The Majority properly deems the claim waived; I would add the following to that analysis.

Appellant's view that direct appeal counsel's duties were limited in cases, like this one, which were litigated before *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002) was decided, is erroneous. The *Grant* Court dispensed with the requirement, embodied in *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977), that ineffectiveness claims always be raised at the defendant's first opportunity (*i.e.*, as soon as he acquires new counsel) "regardless of the myriad of impracticalities associated with such an unbending pronouncement." *Grant*, 813 A.2d at 733. One of the impracticalities of the *Hubbard* rule—and one of the principal reasons *Grant* abandoned it in favor of a general rule deferring ineffectiveness claims until collateral review—derives from the fact that "ineffectiveness claims, by their very nature, often involve claims that are not apparent on the record." *Id.* at 737. Thus, we noted that, under *Hubbard*, appellate counsel was obliged to "not only scour the existing record for any issues," but also had the

> additional burden of raising any extra-record claims that may exist by interviewing the client, family members, and any other people who may shed light on claims that could have been pursued before or during trial and at sentencing.

Importantly, appellate counsel [had to] perform this Herculean task in the limited amount of time that is available for filing an appeal from the judgment of sentence—30 days. *Id.; see also Commonwealth v. Moore*, 580 Pa. 279, 860 A.2d 88, 98 (2004) (noting that because direct appeal preceded *Grant*, appellate counsel was obliged to argue that trial counsel was ineffective for failing to raise sufficient mitigation evidence "even though there was no record of what mitigating evidence was available to trial counsel"); *Commonwealth v. Ford*, 570 Pa. 378, 809 A.2d 325, 344 n. 5 (2002) (Castille, J., dissenting) ("The fact that a claim appears to have arguable merit in hindsight ... says nothing about the objective reasonableness of appellate counsel's performance on appeal— which requires an assessment of the case from **appellate counsel's perspective.** This is especially so in a case ... where the claim is a non-record one."); *cf. Commonwealth v. Porter*, 556 Pa. 301, 728 A.2d 890, 895 (1999) (declining to require that PCRA counsel "launch into an extra-record investigation of every claim raised by a PCRA petitioner on collateral attack" before determining that claims lack merit for purposes of filing "no merit" letter pursuant to *Commonwealth v. Turner*, 518 Pa. 491, 544 A.2d 927 (1988)). While *Grant* recognized and responded to the difficulties inherent in the obligations of appeal counsel under *Hubbard*, we did not suggest there, or in any other case, that direct appeal counsel "could not" pursue non-record claims, or could not be faulted for failing to pursue obvious and meritorious non-record claims.

Indeed, on multiple occasions, this Court has found an appellate lawyer ineffective for failing to raise or prove that trial counsel was ineffective in his mitigation investigation for the penalty phase of a capital trial. *See, e.g., Commonwealth v. Williams*, 597 Pa. 109, 950 A.2d 294, 305 (2008) (finding that appellate counsel failed to "provid[e] essential support for the claim of trial counsel ineffectiveness in the failure to investigate and present available mitigation" where trial counsel had failed to request defendant's complete medical records or arrange for mental health examination despite trial counsel's

constructive notice of potential relevance of mental-health issues); *Commonwealth v. Gorby,* 589 Pa. 364, 909 A.2d 775, 792 (2006) (finding appellate counsel ineffective for failing to raise ineffectiveness of trial counsel during penalty phase where trial counsel failed to obtain medical, educational, or social-history records, or consult mental-health professional); *Ford,* 809 A.2d at 331 (Opinion Announcing the Judgment of the Court) [4] (finding appellate counsel ineffective for failing to raise trial counsel's ineffectiveness for "present[ing] virtually no evidence of mitigating circumstances"); *see also Commonwealth v. (Damon) Jones,* 590 Pa.202, 912 A.2d 268, 294–95, 291 (2006) (remanding for PCRA evidentiary hearing on claim of ineffective assistance of appellate counsel for failure to raise ineffectiveness of trial counsel during penalty phase where trial counsel "called no witnesses and presented no evidence at Jones' penalty hearing"); *Commonwealth v. Gibson,* 596 Pa. 1, 940 A.2d 323 (2005) (*per curiam*) (remanding for PCRA evidentiary hearing on claim of ineffective assistance of appellate counsel based on ineffectiveness of trial counsel in investigation of mitigation evidence).

Finally, although the issue arises most often with respect to layered ineffectiveness claims based on the investigation (or lack thereof) of potential mitigation evidence during the penalty phase of a capital trial, we have previously considered layered ineffectiveness claims involving other types of extra-record evidence. *See, e.g., Commonwealth v. Dennis,* 597 Pa. 159, 950 A.2d 945, 964 (2008) (remanding for consideration of, *inter alia,* claim that appellate counsel was ineffective for failing to "discover and assert" trial counsel's ineffectiveness for failing to interview potential alibi witness). In light of this ample precedent, appellant's theory that he need not prove appellate counsel ineffective in instances requiring layered claims fails. The fact that a claim is partially or wholly extra-

4. Although there was no Majority Opinion in *Ford,* former Justice Newman authored a concurring opinion, which Justice Saylor joined, in which she specifically expressed her agreement "that appellate counsel acted ineffectively by neglecting to raise trial counsel's ineffectiveness for failing to investigate and present evidence during the penalty phase of Appellant's history of abuse and mental illness." *Ford,* 809 A.2d at 336 (Newman, J., joined by Saylor, J., concurring).

record may well be relevant to an assessment of appellate counsel's performance and to the prospect for relief, but it does not alter the fact that such claims were available before *Grant*, and counsel could be held to answer for unreasonable and prejudicial defaults under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Turning to Claim VII, appellant cites *Lankford v. Idaho*, 500 U.S. 110, 111 S.Ct. 1723, 114 L.Ed.2d 173 (1991), in which the U.S. Supreme Court held that due process requires that the defense be provided pre-hearing notice of the prosecution's intent to seek the death penalty. Appellant claims that direct appeal counsel was ineffective for failing to raise a claim based on the prosecutor's failure to notify the defense, before appellant's penalty hearing, of the aggravating circumstances it intended to prove to the jury. *Lankford* was not decided until after this Court denied relief on appellant's direct appeal, but while appellant's reargument petition was pending. Appellant argues that direct appeal counsel was ineffective both for failing to raise the claim before *Lankford* was decided and, once it was decided, for failing to pursue the claim by filing a supplemental reargument petition. *See* Appellant's Brief at 65 & n.35.

The Majority denies relief on appellant's *Lankford* claim on the grounds of lack of prejudice, concluding that "no amount of notice of the aggravators to be sought would have allowed Appellant's counsel the opportunity to mount a defense to them." Majority Op. at 321, 980 A.2d at 93. The Majority is certainly correct on this point, but the claim fails for more fundamental reasons. First, appellate counsel cannot be faulted for failing to raise a *Lankford* claim before *Lankford* was decided. Moreover, the notion that counsel can be faulted for failing to forward the new case as a supplemental basis for reargument is mistaken. Reargument does not exist to allow a party to raise new claims, whether via the relaxed waiver doctrine or some other theory, but, rather, to specify error concerning the claims that were raised and rejected. Appellant cites no cases where, under relaxed waiver or any other theory, this Court entertained new claims premised upon new

and non-retroactive U.S. Supreme Court decisions that were not anticipated by the appellant. Notably, the High Court in *Lankford* did not hold that its decision applied globally, *i.e.*, to all defendants irrespective of whether they raised and preserved the claim. This is not surprising given that neither of the two narrow exceptions set forth in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality) to the general rule of non-retroactivity of new rules [5] would apply here, as *Lankford* neither: (1) forbade a certain category of punishment for a class of defendants because of their status or offense; [6] nor (2) announced a "watershed rule[ ] of criminal procedure implicating the fundamental fairness and accuracy of a criminal proceeding." *Teague*, 489 U.S. at 311, 109 S.Ct. 1060.[7]

Moreover, while the Majority does not address the merits of appellant's *Lankford* claim (as it need not for the reasons just stated), the Commonwealth is correct that *Lankford* is readily distinguishable. As the Commonwealth notes, this Court addressed a *Lankford* claim in *Commonwealth v. Pirela*, 556 Pa. 32, 726 A.2d 1026, 1031–32 n. 9 (1999). In *Pirela*, the appellant raised an ineffectiveness claim based on his allegation that his waiver of his right to a jury trial was invalid because the trial court had told the appellant prior to trial that he would not be subject to the death penalty. In denying relief on the appellant's ineffectiveness claim on collateral review, this Court noted that his allegation had been rejected on direct

5. Although *Teague's* retroactivity analysis did not garner five votes, a majority of the High Court soon thereafter reaffirmed the *Teague* plurality's rule and its two exceptions in *Penry v. Lynaugh*, 492 U.S. 302, 313, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

6. *Compare with Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (holding that juveniles are constitutionally ineligible for death penalty); *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding that mentally retarded capital murderers are constitutionally ineligible for death penalty); *see also Commonwealth v. Miller*, 585 Pa. 144, 888 A.2d 624, 629 n. 5 (2005) (noting that *Atkins* would qualify for retroactive application under first *Teague* exception).

7. *See Saffle v. Parks*, 494 U.S. 484, 495, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990) (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (holding that a defendant has right to be represented by counsel in all criminal trials for serious offenses) to illustrate "the type of rule coming within" second *Teague* exception).

appeal. We also rejected the appellant's reliance on *Lankford*, observing that the trial court had notified the appellant in an extensive waiver colloquy prior to the sentencing hearing that the court was considering the death sentence. We distinguished *Lankford*, noting that, in that case, it was undisputed that "the prosecutor declared that he was not seeking the death penalty and explained at the sentencing hearing why he was not seeking the death penalty; defense counsel did not argue against the death sentence; and, the court gave no indication at the sentencing hearing that the court was considering a death sentence." *Id.* Noting that "this was not a case where the prosecutor or the court represented that a certain penalty would not be imposed and appellant relied to his detriment," we denied relief in *Pirela. Id.*

Appellant now asserts that, "[i]n *Lankford v. Ohio*, the Court ruled that Due Process requires appropriate pre-hearing notice of the aggravating factor(s) the prosecution will rely on in seeking a sentence of death." Appellant's Brief at 64 (citation omitted). But appellant misstates the holding of *Lankford.* As we noted in *Pirela*, the issue in *Lankford* was "whether a defendant had adequate notice that the death sentence may be imposed." *Pirela*, 726 A.2d at 1031 n. 9; *see also Lankford*, 500 U.S. at 119, 111 S.Ct. 1723 (framing "narrow legal issue" as "whether, at the time of petitioner's sentencing hearing, he and his counsel had adequate notice that the judge might sentence him to death"). While the *Lankford* Court did suggest that, "if the State ... indicated an intention to rely on only three aggravating circumstances, the defense could reasonably have assumed that the evidence to be adduced would relate only to those three aggravating circumstances," *id.* at 120, 111 S.Ct. 1723 the facts before the Court did not require it to decide whether due process requires pre-hearing notice of which aggravating circumstances the prosecution intends to prove. And the Court was careful, in setting forth its holding, to use language tailored to the facts before it. *See, e.g., id.* at 127, 111 S.Ct. 1723 ("Petitioner's lack of adequate notice **that the judge was contemplating the imposition of the death sentence** created

an impermissible risk that the adversary process may have malfunctioned in this case.") (emphasis added). Therefore, because appellant does not allege that he was not notified before his penalty hearing that the Commonwealth intended to seek the death penalty, appellant's underlying *Lankford* claim, even if reviewable, is patently meritless.[8]

Finally, respecting Claim IX, which is premised upon *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), the Majority notes that the U.S. Supreme Court did not decide *Mills* until after appellant's trial, but instead during the pendency of his direct appeal. Given these circumstances, the Majority rightly rejects appellant's claim that trial counsel was ineffective for failing to anticipate *Mills*. The Majority cites *Duffey, supra,* as support for rejecting appellant's *Mills* claim, but I would add that this Court has repeatedly denied *Mills* relief under such circumstances. *See, e.g., Commonwealth v. Steele*, 599 Pa. 341, 961 A.2d 786, 831 (2008); *Commonwealth v. Cox*, 581 Pa. 107, 863 A.2d 536, 554 (2004); *see*

8. In his Reply Brief, appellant asserts that "the *Lankford* principle has been applied to the failure to provide timely notice of aggravating factors." Reply Brief at 23. In support of this assertion, appellant quotes *Duvall v. Reynolds*, 139 F.3d 768, 797 (10th Cir.1998), in which the Tenth Circuit, citing *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), stated that "a defendant must have a meaningful opportunity to deny or explain the State's evidence used to procure a death sentence." Even if *Duvall* were binding on this Court, it would be of no help to appellant. First, even assuming *Gardner* otherwise supports the proposition that appellant quotes from *Duvall, Gardner* is an Opinion Announcing the Judgment of the Court that was joined by only two Justices. More importantly, the claim in *Duvall* was that the defendant was not given adequate notice "of the State's evidence in support of" a certain aggravating circumstance that the State had notified the appellant it intended to prove, *see Duvall*, 139 F.3d at 797 (noting that "[t]he Bill of Particulars In Rem Punishment advised Mr. Duvall that the State was seeking the death penalty because the murder was especially heinous, atrocious or cruel"). The *Duvall* court first determined that the claim (which is obviously distinct from appellant's claim before this Court) was procedurally defaulted and then concluded that, in any event, the claim lacked merit, "find[ing] nothing in the record to suggest that the state denied Mr. Duvall due process in this case." *Id.* Therefore, appellant's reliance on *Duvall* is unavailing, as is his unexplained companion citation to *Szuchon v. Lehman*, 273 F.3d 299 (3d Cir.2001), *see id.* at 315 (denying relief on claim that defendant "was provided inadequate notice that he faced the death penalty").

*also id.* at 557 (Castille, J., joined by Eakin, J., concurring) ("[S]ince *Mills* does not apply retroactively to those who failed to preserve a *Mills* claim for direct review, [*see Beard v. Banks,* 542 U.S. 406, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004),] appellant was not entitled to its benefit on appeal once he had failed to lodge an objection below. In such a circumstance, it would be an arbitrary windfall to allow the doctrine of relaxed waiver-a doctrine since abrogated by this Court . . .-and ineffective assistance of counsel to permit appellant to upset a final verdict which was fundamentally fair when rendered.").

I part ways with the Majority, however, when it comes to Footnote 37 and Footnote 38. In Footnote 37, the Majority states that it will not address appellant's claim that direct appeal counsel was ineffective for failing to pursue a *Mills* claim because appellant's underlying claim of ineffectiveness fails. Appellant's *Mills* argument is admittedly brief, disjointed and careless. Thus, for example, he declares that *Mills* was "clearly established law" **at the time of appellant's trial,** Appellant's Brief at 68 (emphasis by appellant), only to admit on the very next page, as he must, that *Mills* was not decided until several months after his trial. In addition, there is an aspect of the claim (again, it is not clear as appellant blends several undeveloped theories in a single paragraph) that plainly alleges layered ineffectiveness, and the Majority's disposition handles that aspect of the claim. However, it also appears that, inarticulate as the claim is, appellant intends a stand-alone, albeit near-boilerplate argument that appellate counsel independently was ineffective for failing to press *Mills* because the decision was rendered before his direct appeal was briefed and decided, and, he thinks, all changes in the law effected by decisions of the High Court "will be given effect while a case is on direct review.'" *Id.* at 69 (citation omitted).

This would-be stand-alone claim of appellate counsel ineffectiveness is not responsibly forwarded: indeed, appellant inexplicably fails even to cite or discuss the U.S. Supreme Court's decision in *Beard v. Banks,* which held that *Mills* was a new rule which has no retroactive effect. The answer to appellant's claim that appellate counsel was ineffective for failing to

seek relief premised upon *Mills* is in decisional law from this Court that appellant neither cites nor challenges, which notes that new, otherwise non-retroactive constitutional rules are available to succeeding defendants still on direct appeal only if the defendant has argued and preserved the point below, which appellant did not do here. *See Commonwealth v. Hughes*, 581 Pa. 274, 865 A.2d 761, 809 (2004); *Cox*, 863 A.2d at 554; *see also id.* at 555–57 (Castille, J., joined by Eakin, J., concurring); *accord Commonwealth v. (James) Jones*, 597 Pa. 286, 951 A.2d 294, 302–04 (2008); *Commonwealth v. Sneed*, 587 Pa. 318, 899 A.2d 1067, 1075 (2006).

After rejecting appellant's *Mills* claim, the Majority unnecessarily adds the *obiter dictum* which comprises Footnote 38, and which purports to "acknowledge [ ] that Appellant may find relief in the federal courts on this issue," citing the decisions of the U.S. Court of Appeals for the Third Circuit in *Abu–Jamal v. Horn*, 520 F.3d 272 (3d Cir.2008) (*"Abu–Jamal II "*) and *Kindler v. Horn*, 542 F.3d 70 (3d Cir.2008). Majority Op. at 328 n.38, 980 A.2d at 96 n.38. There is no basis for this *dictum*. Preliminarily, I would note that both of these questionable Third Circuit precedents may not be long for the appellate world. Abu–Jamal's petition for *certiorari* has been denied, *see Abu–Jamal v. Beard*, —— U.S. ——, 129 S.Ct. 1910, 173 L.Ed.2d 1062 (2009), but the Commonwealth's *certiorari* petition, confined to the *Mills* question, is still pending. *See Beard v. Abu–Jamal, petition for cert. filed*, No. 08–652 (Nov. 14, 2008). Notably, the High Court also has granted review in a Sixth Circuit case posing a similar question arising from federal *habeas* courts extending the rule in *Mills* beyond its terms and then retroactively faulting state courts for failing to follow the lower federal court's extensions. *Smith v. Spisak*, —— U.S. ——, 129 S.Ct. 1319, 173 L.Ed.2d 583 (2009). Presumably, the Court is holding *Abu–Jamal* pending *Spisak*.

Meanwhile, the Court has already granted the Commonwealth's petition for *certiorari* in *Kindler, see Beard v. Kindler*, —— U.S. ——, 129 S.Ct. 2381, 173 L.Ed.2d 1292 (2009). The question there involves the Third Circuit ignoring a Pennsylvania procedural default rule-the fugitive forfeiture

rule-so that it could retroactively impose its idiosyncratic view of *Mills* to upset a death verdict in a Pennsylvania case tried before *Mills* was decided.

I am not sure what point is served by Footnote 38, unless it is to convey the Majority's preference for the Third Circuit's approach, which seems to reflect a determination to grant *Mills* relief in pre-*Mills* cases, notwithstanding the deference standard commanded by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), *see* 28 U.S.C. § 2254(d); the absurdity of finding error in a case premised upon the retroactive application of a non-retroactive new rule of law; and the fact that the Third Circuit's view of what *Mills* commands on *habeas* review is not exactly a paragon of clear and consistent application.[9] It may well be that the Third Circuit will find a way to retroactively impose its current take on *Mills* in this case, just as it has in *Abu–Jamal, Kindler, Banks,* and other cases. But, contrary to the Majority's assumption, this case is not like *Abu–Jamal.* In order to reach the waived *Mills* claim, the Third Circuit in *Abu–Jamal* construed this Court's decision on PCRA review as if we were entertaining a preserved *Mills* claim on direct review-notwithstanding this Court's explanation at the outset of our PCRA opinion that we were entertaining the appellant's waived claims only under the guise of his overarching argument of "layered ineffectiveness." *Commonwealth v. Abu–Jamal,* 553 Pa. 485, 720 A.2d 79, 88 & n. 9 (1998) (*"Abu–Jamal I "*).

9. *Compare Zettlemoyer v. Fulcomer,* 923 F.2d 284, 306–08 (3d Cir.1991), *cert. denied,* 502 U.S. 902, 112 S.Ct. 280, 116 L.Ed.2d 232 (1991) (applying non-deferential pre-AEDPA standard; upholding standard instructions in Pennsylvania capital murder trial against *Mills* challenge) *with Frey v. Fulcomer,* 132 F.3d 916, 920–24 (3d Cir.1997), *cert. denied,* 524 U.S. 911, 118 S.Ct. 2076, 141 L.Ed.2d 151 (1998) (applying non-deferential pre-AEDPA standard; disapproving of similar charge because trial court's use of words "unanimous" and "mitigating" were closer in space than in *Zettlemoyer,* but noting that Commonwealth's counter-argument was "plausible"); *and Banks v. Horn,* 271 F.3d 527, 545–49 (3d Cir.2002), *rev'd sub nom. Beard v. Banks,* 542 U.S. 406, 124 S.Ct. 2504, 159 L.Ed.2d 494 (2004) (disapproving of similar charge; though purporting to apply AEDPA's deferential standard, concluding that *Mills* relief was warranted because "same concerns" animating non-deferential *Frey* decision rendered state court determination objectively unreasonable).

Even leaving aside the question of whether the Third Circuit's grounds for giving retroactive effect to a non-retroactive decision are plausible in *Abu–Jamal II,* in this case we have made clear that appellant's *Mills* claim is defaulted, and the only cognizable collateral claim he has is a derivative claim concerning trial and direct appeal counsel. Thus, the Third Circuit presumably would have to invoke a reason other than the one devised in *Abu–Jamal* if it is determined to grant retroactive *Mills* relief here.

Justice EAKIN joins this opinion.

Justice SAYLOR, Concurring and Dissenting.

I concur in the result as to guilt-phase relief and respectfully dissent as to penalty, as I would remand for further proceedings.

In the post-conviction hearings, trial counsel testified that he conducted effectively no pre-trial penalty-phase investigation and, indeed, did not so much as ask Appellant about his background. *See* N.T., April 4, 2000, at 312, 315, 377.[1] It is undisputed that, prior to the penalty hearing, counsel also did not even attempt to learn what aggravating circumstances the Commonwealth intended to pursue. The majority finds the obviously disturbing claim arising out of counsel's lack of preparation to be waived, since it was not properly layered under *Commonwealth v. McGill,* 574 Pa. 574, 832 A.2d 1014 (2003). My position on this matter is reflected in the following statement from my dissenting opinion in *Commonwealth v. Gwynn,* 596 Pa. 398, 943 A.2d 940 (2008):

> I ... have favored the allowance of some time for *McGill* to become institutionalized among the capital bar, as we certainly have not seen immediate, consistent, or even ordinary

---

1. The PCRA court did not reject counsel's testimony on credibility grounds, but rather, held that trial counsel pursued a reasonable strategy at trial. Such conclusion is unsustainable, however, in the absence of an assessment of the adequacy of the underlying penalty investigation. *See Wiggins v. Smith,* 539 U.S. 510, 527, 123 S.Ct. 2527, 2538, 156 L.Ed.2d 471 (2003) (explaining that "a reviewing court must consider the reasonableness of the investigation said to support that strategy").

compliance. However, my personal tolerance expired in November 2006, with the issuance of [*Commonwealth v.*] *Marinelli*, [589 Pa. 682, 910 A.2d 672 (2006),] in which I indicated that I would no longer maintain a minority position supporting temporary leeway for briefs failing to meet *McGill's* specific requirements. *See Marinelli*, 589 Pa. at 714–15, 910 A.2d at 691 (Saylor, J., concurring).[fn] In this regard, however, the present matter was submitted well before *Marinelli* was rendered. Accordingly, I have reviewed [the a]ppellant's claims regarding appellate counsel's stewardship and remain of the belief that a remand for further proceedings is warranted.

[fn] It should be noted, however, that in these cases in which the Court is criticizing capital post-conviction counsel for the inability even to frame a claim in the only established manner in which review can be obtained, we are openly confirming a patent deficiency in such counsel's stewardship. It certainly remains arguable that ineptitude of this sort and magnitude should not redound to the detriment of an indigent petitioner pursuing what is likely to be his single opportunity to secure state post-conviction appellate review of his sentence of death.

*Id.* at 421, 943 A.2d at 954 (Saylor, J., concurring and dissenting).

Since Appellant's briefs also were filed prior to *Marinelli*, I would extend similar latitude here.